Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
12/16/2016 09:07 AM CST

In re Interest of Darryn C., a child
under 18 years of age.
State of Nebraska, appellee, v. Sarah J. and
Nathanial C., appellees, and Sharon J.,
intervenor-appellant.

___ N.W.2d ___

Filed December 16, 2016.    No. S-15-1159.

1. **Jurisdiction: Appeal and Error.** Before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it.
2. **Jurisdiction: Final Orders: Appeal and Error.** For an appellate court to acquire jurisdiction of an appeal, there must be a final order entered by the court from which the appeal is taken.
3. **Juvenile Courts: Final Orders: Appeal and Error.** Juvenile court proceedings are special proceedings under Neb. Rev. Stat. § 25-1902 (Reissue 2016), and an order in a juvenile special proceeding is final and appealable if it affects a substantial right.
4. **Final Orders: Appeal and Error.** A substantial right is affected if the order affects the subject matter of the litigation, such as diminishing a claim or defense that was available to an appellant prior to the order from which an appeal is taken.
5. **Juvenile Courts: Final Orders: Time.** Whether a substantial right has been affected by an order in juvenile court litigation is dependent upon both the object of the order and the length of time over which the relationship with the juvenile may reasonably be expected to be disturbed.

Appeal from the Separate Juvenile Court of Douglas County: Christopher Kelly, Judge. Appeal dismissed.

Jeffrey A. Wagner and Ryan P. Watson, of Schirber & Wagner, L.L.P., for appellant.

Donald W. Kleine, Douglas County Attorney, and Amy Schuchman for appellee State of Nebraska.

Heavican, C.J., Wright, Miller-Lerman, Cassel, Stacy, Kelch, and Funke, JJ.

Kelch, J.

## I. NATURE OF CASE

Sharon J., the paternal grandmother of Darryn C., appeals from the juvenile court's December 2, 2015, order, which overruled her motion for custody of Darryn and further ordered that home studies be conducted on her two homes.

## II. FACTS

On November 12, 2013, the separate juvenile court of Douglas County determined that it had jurisdiction over Darryn pursuant to Neb. Rev. Stat. § 43-247(3)(a) (Supp. 2013), which grants juvenile courts jurisdiction over any juvenile who is lacking proper parental care by reason of the faults or habits of his or her parent. The court made this determination based on the admissions of Darryn's biological parents, Sarah J. and Nathanial C. At the adjudication hearing, the mother admitted that she placed Darryn at risk for harm due to her "use of alcohol and/or controlled substances" and the father admitted that he had placed Darryn at risk for harm by engaging in domestic violence with the mother.

At the time of the adjudication hearing, Darryn had already been removed from his home in Omaha, Nebraska, and was in the custody of the Department of Health and Human Services (DHHS). One month prior to the adjudication hearing, when Darryn was placed in foster care, Sharon, Darryn's paternal grandmother, helped place Darryn with her sister Judi L., who lived near Darryn's parents in Omaha. At that time, Sharon lived in Clarksville, Iowa, which was a 4½-hour drive from Omaha.

In the juvenile court's November 12, 2013 order, the court ordered that Darryn remain in the care of DHHS. Among other

things, the court ordered the parents to undergo pretreatment assessments for chemical dependency and submit to random drug and alcohol testing. The parents were allowed reasonable rights of supervised visitation.

On December 3, 2013, Sharon filed a complaint to intervene and requested that Darryn be placed with her. On January 15, 2014, the juvenile court allowed her to intervene, but overruled her request for placement. It found that at the time of the order, the permanency objective for Darryn was reunification and that it was in the best interests of the child to remain in his current placement.

On January 12, 2015, the juvenile court issued an order changing the permanency objective from reunification to reunification concurrent with adoption. The order also mandated Darryn to undergo a psychological evaluation and participate in individual therapy.

At a review hearing on July 1, 2015, both Darryn's case manager and Darryn's guardian ad litem (GAL) expressed concerns related to Darryn's interactions with his mother, father, and Sharon. Darryn's case manager reported that Darryn had said "concerning things" to his therapist. The case manager testified that although the parents were not to be visiting Darryn together, Darryn had disclosed that when he visited his mother, his father would be present. The case manager also said that although Darryn's parents were not to have unsupervised contact with Darryn, Darryn had disclosed that when he visited Sharon, she would transport him to and leave him with one of his parents. When confronted by the case manager, the mother, the father, and Sharon denied the allegations.

The GAL also expressed concern over Darryn's obsession with superheroes and violent play, which his therapist had noted was "above that of a typical six-year-old." The GAL's June 25, 2015, report reflects that the therapist had expressed concerns about Darryn's behaviors, "including overly violent play as well as talking to/pretend play with superheroes."

According to the GAL's report, Darryn's therapist "stated that Darryn's aggression is 'off the charts', and that when Darryn engages in superhero role play, he uses different voices such that 'you would think someone else is there.'" The therapist did not testify at the review hearing.

The GAL also told the court that neither Darryn's parents nor Sharon seemed to be taking the superhero obsession seriously. She stated that "on every single visit with his parent [Darryn] ends up watching a superhero video." She also claimed that Sharon had taken Darryn to see the new "Avengers" superhero movie. Sharon's attorney suggested that this latter claim was false and that Sharon had not been advised of the superhero issue until the week prior. Sharon requested an evidentiary hearing on the matter.

Based on the concerns expressed by Darryn's case manager and GAL, the court ordered that all visitations were to be supervised until, at least, the next hearing, which was scheduled to take place the next month. At that hearing, the juvenile court reinstated Sharon's reasonable rights of unsupervised visits with Darryn.

Toward the end of the July 1, 2015, review hearing, the juvenile court reminded the State that the county attorney was required to file a motion to terminate parental rights where a child has been in an out-of-home placement for 15 of the previous 22 months and that this case was "six months beyond that point." On August 24, the State moved to terminate the parental rights of both parents.

On November 24, 2015, Sharon filed a motion for custody after the mother and father had relinquished their parental rights to her. She also filed a motion for continued visitation. The same day, Randall J., Sharon's husband, filed a complaint to intervene. Darryn's mother and father did not resist Sharon's motion for custody; however, the State, Darryn's GAL, and DHHS did. The matter was set for December 1, the same day as the hearing on the termination of parental rights.

## 1. HEARING ON MOTION
### FOR CUSTODY

At the hearing on Sharon's motion for custody, Sharon offered voluntary relinquishments signed by both parents, conveying to Sharon and Randall "all right to and custody of and power and control over [Darryn]." No objection was made, and the relinquishments were received by the court. As for witnesses, Sharon, Randall, and Darryn's therapist were all called to testify.

### (a) Sharon's Testimony

Sharon testified that when she had helped place Darryn with her sister Judi in October 2013, the understanding was that Darryn and his parents would reunite, and that if reunification was not possible, Sharon would step in and raise Darryn. She explained that she did not initially request that Darryn be placed with her, because she had hoped that Darryn would reunite with his parents and she lived 4½ hours from Darryn's parents, which would have made reunification difficult.

After Darryn was placed with Judi, Sharon visited Darryn every 2 to 3 weeks. Sharon testified that she would have Darryn for overnight visits over the weekend until June 2015, when her visitation rights were changed to supervised. After September, she was allowed unsupervised visitation again.

In October 2015, after it became apparent that reunification of Darryn with his parents was no longer possible, Sharon moved to Omaha to a two-bedroom apartment 3 miles from Darryn's school. She then requested that Darryn be placed in her custody. Sharon testified that she and her husband, Randall, were ready, willing, and able to have Darryn placed in their home as a placement or to assume custody.

Although Sharon had selected Judi for placement, Sharon expressed concerns that if Darryn were to remain with Judi, Darryn would be prevented from having a relationship with his other family members. Sharon testified that Judi does not

have ties within the family. Sharon explained that until the last few weeks, she and Judi had not had any communication for the last 2 years. Sharon testified that she and Judi have been participating in therapy to attempt to fix the relationship, but at the time of the hearing on her motion, the relationship had not been healed.

Sharon also expressed concerns about Judi's health. She testified that Judi has had back surgeries, with resultant limited mobility, and diabetes. Sharon testified, "[S]he's pretty much 90 percent dependent physically on her husband to get around."

### (b) Randall's Testimony

Although Sharon had moved to Omaha in October 2015, Randall continued to reside in Iowa at the time of the hearing on Sharon's motion for custody. Randall testified that he supported Sharon's endeavors and that he wanted to adopt Darryn as his own child. Randall testified that he believed it was in Darryn's best interests that Darryn be placed with Sharon and Randall. Randall explained that if they were granted custody, he and Sharon would resume residence together and proceed with adoption.

### (c) Therapist's Testimony

Darryn's therapist testified that she has worked with Darryn since December 2013 and that in the 9 months prior to the hearing, she had started to discuss placement with Darryn. She testified that Darryn, who was 7 years old at the time of the discussion, told her that he would like to remain in his current placement with Judi and her husband. The therapist admitted that she did not fully understand Darryn's basis for wanting to live with Judi and that his decision may not have been fully informed, but she believed that remaining in his current placement was in Darryn's best interests, because he had been there for over 2 years. She testified that if Darryn became available for adoption, Judi and her husband had stated that they would adopt Darryn. Neither Judi nor her husband appeared or testified at the hearing.

On cross-examination, the therapist stated that she had no indication that Sharon and Randall were unfit parents and that she had no reason to believe that Darryn had a negative relationship with Sharon. She also stated that she did not know what effect placement with Sharon and Randall would have on Darryn.

After some questioning from the court, the therapist testified that she had facilitated the therapy sessions between Sharon and Judi. When asked if she was able to identify issues between the two, the therapist explained that the biggest barrier in their relationship seemed to be a communication breakdown.

The court also asked the therapist about her understanding as to Judi's propensity to allow Darryn to have contact with extended family members. The therapist told the court that Judi had stated she would allow it and that over the past Thanksgiving holiday, Darryn was allowed to spend quite a bit of time with Sharon and his extended family. On cross-examination, however, the therapist admitted that up until recently, Judi had not had any contact with her extended family, and that the Thanksgiving visit was not something that Judi had volunteered, but was something that had to be facilitated through Sharon and Judi's counseling sessions. The therapist testified that it was in Darryn's best interests to maintain contact with his extended family.

## 2. DISPOSITION OF SHARON'S
### MOTION FOR CUSTODY

On December 2, 2015, the juvenile court issued an order overruling Sharon's motion for custody. The court also ordered that DHHS conduct home studies of Sharon and Randall's two homes and that DHHS obtain Judi's medical records. Sharon appeals from the December 2 order.

As for the proceedings on the State's motions to terminate parental rights and Randall's motion to intervene, those proceedings were continued to January 8, 2016. The record

does not reflect the court's disposition of the State's and Randall's motions.

## III. ASSIGNMENTS OF ERROR

Sharon assigns that the juvenile court erred in (1) failing to find that the relinquishment of parental rights to Sharon provided her priority under the parental preference doctrine and (2) in finding that it was not in the best interests of Darryn to be placed in Sharon's custody.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings.[1]

A jurisdictional question which does not involve a factual dispute is determined by an appellate court as a matter of law, which requires the appellate court to reach a conclusion independent of the lower court's decision.[2]

## V. ANALYSIS

[1] Before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it.[3] This case presents two separate jurisdictional issues: (1) whether the order appealed from is a final, appealable order and (2) whether Sharon has standing to appeal. Because we determine that the order appealed from is not a final order, we do not reach the standing issue. An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it.[4]

---

[1] *In re Interest of Enyce J. & Eternity M.*, 291 Neb. 965, 870 N.W.2d 413 (2015).

[2] *Steven S. v. Mary S.*, 277 Neb. 124, 760 N.W.2d 28 (2009).

[3] *Id.*

[4] *In re Interest of Jackson E.*, 293 Neb. 84, 875 N.W.2d 863 (2016).

[2-5] For an appellate court to acquire jurisdiction of an appeal, there must be a final order entered by the court from which the appeal is taken.[5] Juvenile court proceedings are special proceedings under Neb. Rev. Stat. § 25-1902 (Reissue 2016), and an order in a juvenile special proceeding is final and appealable if it affects a substantial right.[6] A substantial right is affected if the order affects the subject matter of the litigation, such as diminishing a claim or defense that was available to an appellant prior to the order from which an appeal is taken.[7] Whether a substantial right has been affected by an order in juvenile court litigation is dependent upon both the object of the order and the length of time over which the relationship with the juvenile may reasonably be expected to be disturbed.[8]

The issue in this case is analogous to the issue of whether an order changing a permanency objective from family reunification to another objective is a final, appealable order. This court has recently addressed that issue in *In re Interest of LeVanta S*.[9] In *In re Interest of LeVanta S.*, we explained that at least in the context of children adjudicated under § 43-292(3)(a), "an order is not a final, appealable order unless the parent's ability to achieve rehabilitation and family reunification has been clearly eliminated."[10] Similarly, we think the proper inquiry in this case is whether the court's order overruling Sharon's motion for custody clearly eliminated Sharon's ability to gain custody of Darryn. As with cases involving the changing of a permanency objective, this

---

[5] *In re Interest of Octavio B. et al.*, 290 Neb. 589, 861 N.W.3d 415 (2015).

[6] *In re Interest of Mya C. & Sunday C.*, 286 Neb. 1008, 840 N.W.2d 493 (2013).

[7] *Steven S. v. Mary S., supra* note 2.

[8] See *id.*

[9] *In re Interest of LeVanta S., ante* p. 151, ___ N.W.2d ___ (2016).

[10] *Id*. at 162, ___ N.W.2d at ___.

inquiry is very fact specific and "can easily lead to different results from case to case."[11]

Because a court's written order does not always clearly set forth the order's impact on the parties' rights, an appellate court may need to interpret an order to determine whether the order affects a party's substantial right.[12] Such was the case in *In re Interest of Tayla R.*,[13] which involved a written order changing a permanency plan from reunification to adoption. Although the court's order did not say whether the mother would be able to reunify with her children, it directed the mother to continue doing such things as weekly individual therapy sessions, family therapy sessions, and supervised visitation with the children. The Nebraska Court of Appeals read the court's order as "implicitly provid[ing] [the mother] with an opportunity for reunification by complying with the terms of the rehabilitation plan[,] which terms have not changed from the previous order."[14] Because the mother did not lose the ability to reunify with her children, the Court of Appeals determined that the order did not affect a substantial right and was therefore not a final, appealable order. As we noted in *In re Interest of Octavio B. et al.*,[15] this analysis is consistent with our precedent in *In re Interest of Sarah K.*[16]

Although at first glance the order here appears to affect Sharon's right to custody, upon further inspection, it becomes clear that the order does not diminish Sharon's ability to obtain placement or custody. Instead, the order mandates that DHHS conduct a home study of Sharon's homes and sets a "Home

---

[11] *In re Interest of Octavio B. et al., supra* note 5, 290 Neb. at 596, 861 N.W.2d at 422.

[12] See, *id.*; *In re Interest of Tayla R.*, 17 Neb. App. 595, 767 N.W.2d 127 (2009).

[13] *In re Interest of Tayla R., supra* note 12.

[14] *Id.* at 605, 767 N.W.2d at 135.

[15] *In re Interest of Octavio B. et al., supra* note 5.

[16] *In re Interest of Sarah K.*, 258 Neb. 52, 601 N.W.2d 780 (1999).

Study Check" hearing to occur approximately 1 month later, which indicates that the court is still considering Sharon for some type of placement and that the issue of custody will be disposed of within a reasonable amount of time. This finding is supported by the following statements from the bench:

> The Motion for Custody is overruled. I am, however, going to order a couple of things to occur: [DHHS] and [Nebraska Families Collaborative] shall conduct a home study on the home of Sharon and Randall . . . . [DHHS] and [Nebraska Families Collaborative] shall obtain medical records of Judi . . . , based on what I've heard here today.
>
> It's simply not in the child's best interest to uproot him, certainly at this point in time and maybe not ever. I don't know. Okay? But as we sit here today, parental rights are intact.

These comments clearly indicate that the court has not completely disposed of the custody issue and that Sharon may still gain custody.

We therefore conclude that the December 2, 2015, order does not disadvantage Sharon or change or affect a substantial right of Sharon and therefore is not a final, appealable order. Because the order on appeal is not a final, appealable order, we lack jurisdiction to address Sharon's assignments of error, and we dismiss her appeal.

## VI. CONCLUSION

For the foregoing reasons, we conclude that the juvenile court's order was not final and appealable. When an appellate court is without jurisdiction to act, the appeal must be dismissed. We therefore dismiss this appeal for lack of jurisdiction.

APPEAL DISMISSED.