IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF DIAMOND J.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF DIAMOND J., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

CRYSTAL S., APPELLANT.

Filed July 20, 2021.    No. A-21-085.

Appeal from the Separate Juvenile Court of Douglas County: MATTHEW R. KAHLER, Judge. Appeal dismissed.

Thomas C. Riley, Douglas County Public Defender, and Claudia L. McKnight for appellant.

Donald W. Kleine, Douglas County Attorney, and David Ceraso for appellee.

PIRTLE, Chief Judge, and MOORE and WELCH, Judges.

PIRTLE, Chief Judge.

INTRODUCTION

Crystal S. appeals from the order of the Separate Juvenile Court of Douglas County which adjudicated her daughter, Diamond J., to be a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016), and which granted the Department of Health and Human Services (the Department) continued temporary custody of Diamond and provided that placement of Diamond be outside of Crystal's home. Because the award of custody to the Department was temporary in nature, that portion of the order was not final and appealable. We therefore dismiss the appeal for lack of jurisdiction.

- 1 -

BACKGROUND

Diamond was born in February 2003 in Douglas County, Nebraska. Diamond's father is not involved in this appeal; therefore, we do not address the father further except to provide context.

On October 7, 2020, the State filed a petition alleging that Diamond was a child within the meaning of § 43-247(3)(a) through the faults or habits of her mother, Crystal. The petition alleged that Diamond had endured periods of homelessness since September 2019; that Crystal had failed to report Diamond as missing when Diamond's whereabouts were unknown; and that Crystal had contacted law enforcement twice to request that Diamond be removed from her home. The petition further alleged that Crystal had failed to provide for Diamond's daily needs, including food, clothing, and education; that Crystal had failed to provide appropriate care, support, supervision, and/or safety for Diamond; that Crystal had failed to provide safe, stable, and/or appropriate housing for Diamond; and that Crystal's actions put Diamond at a risk for harm.

Also on October 7, the State filed an ex parte motion requesting that the juvenile court place Diamond in the immediate custody of the Department and outside Crystal's home. In a written order, the juvenile court found that reasonable efforts had been made to prevent Diamond's removal and granted the State's ex parte motion, placing Diamond in the temporary custody of the Department in a foster home.

Crystal failed to appear at a first appearance and protective custody hearing on October 19 and on December 10, 2020. An adjudication hearing on the State's petition was held on January 5, 2021, with Crystal present and represented by counsel. The juvenile court read the petition aloud in open court, and Crystal entered a denial as to the contents.

The State first presented the testimony of Diamond, who was 17 years old at the time of the hearing. Diamond testified that prior to being placed in the custody of the Department, she had lived "on the streets" for approximately a year. She testified that before becoming homeless, she had lived with her father; however, the father had "kicked [Diamond] out" in late 2019 because she refused to comply with his order to stop attending psychotherapy. After leaving her father's home, Diamond stayed anywhere "from public places to abandoned houses to friends' to family members', anywhere that [she] could." She testified that she was not in contact with Crystal during this period.

Diamond testified that in September 2020, Crystal reached out to her via Facebook. Diamond informed Crystal that she was pregnant, but neither Crystal nor Diamond attempted to arrange prenatal medical care. Diamond stayed at Crystal's house for "a few weeks on and off" during the month of September, and she estimated that she "stayed there maybe six [nonconsecutive] days in total throughout the whole time." Diamond testified that she and Crystal were involved in multiple altercations during the weeks she stayed with her mother. She testified that Crystal would remove all the food from the house and turn off the power because "she just wanted [Diamond] gone." Diamond testified that although she initially refused to leave Crystal's home for fear of being reported as a runaway, she was ultimately "kicked out" of Crystal's house on four separate occasions.

Toward the end of September 2020, Crystal contacted the police and asked them to remove Diamond from her home; however, the police refused. Diamond testified that Crystal then called

the Department, and a social worker arrived to take Diamond to her father's home. However, Diamond's placement with her father only lasted for a day, as the father informed Diamond that she "needed to be out of his house by the time he got back [from work] or he would make [her] leave himself." Diamond testified that she then began staying with an individual who attempted to recruit her for work as a prostitute.

During cross-examination by the guardian ad litem, Diamond testified that while she was homeless, Crystal never offered her money or a place to stay. She explained that the "on and off" living situation with Crystal in September 2020 deteriorated because Crystal informed Diamond that "if you don't have anything to contribute, then you have to go." She testified that Crystal did not provide her with any clothing or money while she stayed at Crystal's house. Diamond testified that Crystal never made arrangements for her to live somewhere else, and she asserted that she had been "mostly providing for [her]self" since the age of 16.

On cross-examination by Crystal's counsel, Diamond admitted that in early September 2020, Crystal drove her to the emergency room on account of pregnancy-related "bleeding and cramping." She testified that following this incident, she stayed at Crystal's house for 3 consecutive days before Crystal "kicked [her] out" because Diamond refused to sign the proceeds of her grandmother's insurance policy over to Crystal. Diamond further testified that around the middle of September, the police returned her to Crystal's house, but that Crystal kicked her out three subsequent times. Diamond admitted that during this period, she and Crystal engaged in a physical altercation, but she denied laying her hands on Crystal or any other family members except for the purpose of self-defense.

The State next presented the testimony of Janet Watson, a child and family services specialist with the Department. Watson testified that the Department "received an intake with concerns for physical neglect of Diamond by her father . . . on August 25 of 2020." Watson attempted to locate Diamond, who had left her father's house by that time. On September 4, Watson made contact with Diamond and Crystal at Crystal's residence. Watson testified that after speaking to both Diamond and Crystal, she "put a safety plan in place to have the family working with intensive in-home services through Release Ministries." The safety plan also provided that Crystal should report Diamond as a runaway if she left the house without permission.

Watson testified that during September 2020, she received information that Diamond had left Crystal's home on three separate occasions. She testified that Diamond said that Crystal had kicked her out, while Crystal claimed Diamond ran away. According to the Omaha Police Department, Crystal did not file a missing persons report at any time.

Watson testified that on September 23, Crystal called to request that Diamond be removed from her residence due to an altercation. Watson "explained to Crystal that we were not at a point where an affidavit would be written and if she needed Diamond removed from the home, she would need to contact law enforcement." Later that day, Watson went to Crystal's residence, but no one answered the door.

The following day, September 24, Watson spoke with Diamond on the porch of Crystal's home. Watson testified that Diamond made her aware of an issue involving benefits Diamond was to receive from a deceased grandmother, which Crystal wanted Diamond to sign over to her name. Watson testified that she was "shown a video of an altercation between Crystal and Diamond during which Crystal was yelling." While Watson and Diamond were speaking, Crystal exited the

residence, locking all the doors behind her. Crystal told Watson that she "did not want Diamond living with her anymore" because "of the altercations that were occurring." Crystal then drove away, and Diamond told Watson that she had no way to get back inside the house. Watson testified that law enforcement then arrived at Crystal's home and reported that Crystal had requested that Watson be removed from the premises. Subsequently, Watson spoke with Diamond's father, who gave permission for Diamond to be brought to his residence; however, that placement proved unsuccessful.

Watson testified that throughout the time Diamond was homeless, neither of her parents had provided any kind of assistance. She testified that although Diamond had attempted to independently arrange for her own prenatal care, she had been refused treatment because she did not have parental consent. She further testified that Crystal never reached out to her about Diamond's whereabouts, nor did Crystal ever articulate a plan for Diamond to live somewhere else.

On cross-examination, Watson testified that prior to September 2020, Diamond had been staying with a former mentor. However, the mentor reported to Watson "that there was [an] altercation between herself and Diamond that caused [the mentor] to say that Diamond could not live there anymore." Watson admitted that Crystal had told her that Diamond stole her sister's tablet device, but Watson testified that she was unaware if a police report was ever made.

Following Watson's testimony, the State rested its presentation of evidence.

Crystal called her therapist, Mildred Tucker, to testify. Tucker testified that she was an addiction counselor and was completing an internship as a mental health therapist. Tucker first began treating Crystal in May 2020. At the time of the hearing, Tucker met with Crystal twice a week. Tucker testified that Crystal had spoken about Diamond's "disruptive behavior," which included "disrespect, profanity, abuse towards [Crystal]." She further testified that Crystal had described "fights" where Diamond would hit Crystal.

On cross-examination, Tucker admitted that she did not know how frequently Crystal and Diamond had argued. She agreed that she had never met Diamond and that she did not have access to any collateral sources that corroborated Crystal's statements. Tucker testified that Crystal had been diagnosed with bipolar disorder, a personality disorder, major depression disorder, and anxiety. She further testified that her counseling agency was reevaluating Crystal's diagnoses because "she may need a higher level of therapeutic intervention."

Crystal testified that in August 2020, Diamond contacted her and said that she was pregnant and needed Crystal's support. At that time, Crystal and Diamond had not spoken to each other since September 2019, and Diamond's father had had sole legal custody of Diamond for several years. Crystal testified that Diamond "had been living in abandoned houses and stuff" and that she "looked sick, like she hadn't been eating, taking care of herself, or anything." She testified that Diamond stayed at her residence for about a week before leaving on her own.

Crystal testified that in early September, the police returned Diamond to her. She testified that she was willing to have Diamond live with her; however, Diamond told the police "I'm not staying here" and departed 30 to 45 minutes later. Diamond returned to Crystal's house a few days later. Crystal testified that Diamond then began "tormenting" her. She testified that Diamond would wake her up in the middle of the night, would turn her bedroom lights on and off, played loud audio, and physically struck her. Crystal communicated with police about having Diamond

removed from her home, but the police stated there was nothing they could do. She testified that she called Watson and said that "if [Diamond] is going to keep being violent toward me, I don't want her here."

Crystal testified that on September 24, Watson visited her in order to follow up on their phone conversation. She testified that she asked Watson to leave because she was upset that the police had not removed Diamond and because she had a job interview to attend. She did not permit Watson to come inside the home, so instead Watson and Diamond spoke on the porch. Crystal testified that she went to her interview and that she did not "know what happened after all that."

On cross-examination, Crystal denied that she had ever filled out a transfer of benefits form in order to receive Diamond's benefits from her grandmother. She testified that she did not have legal custody of Diamond because she "got into trouble" and was sentenced to a prison term. Crystal asserted that she had been attempting to regain custody of Diamond since 2004.

Following Crystal's testimony, the parties submitted the case to the juvenile court.

The court ruled from the bench, finding by a preponderance of the evidence that the State had proved that Diamond was a child within the meaning of § 43-247(3)(a). The court found that Diamond had endured periods of homelessness, that Crystal had failed to provide for Diamond's daily needs, that Crystal had failed to provide Diamond with appropriate care and housing, and that Diamond was at a risk for harm as a result of Crystal's actions. The court ordered the parties to return for a hearing in 30 days so that Diamond could begin treatment with a therapist who would be in a position to inform the court as to "the best case for this family moving forward." The disposition hearing was scheduled for February 10, 2021.

In an order issued the same day, the juvenile court found that Diamond was a juvenile within the meaning of § 43-247(3)(a) due to the faults or habits of her mother, Crystal; that it would be contrary to Diamond's health and safety to be returned to Crystal's home; and that it was in Diamond's best interests to remain in the temporary care of the Department until further order of the court. The court additionally ordered the Department to complete a predisposition evaluation.

This appeal followed.

## ASSIGNMENT OF ERROR

Crystal assigns that the juvenile court erred in granting the Department continued temporary custody of Diamond.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020).

Determination of a jurisdictional issue which does not involve a factual dispute is a matter of law which requires an appellate court to reach its conclusions independent from those of a trial court. *In re Adoption of Yasmin S.*, 308 Neb. 771, 956 N.W.2d 704 (2021).

ANALYSIS

Crystal does not assign that the juvenile court erred in adjudicating Diamond under § 43-247(3)(a), nor does she advance any arguments related to this issue in her brief. Therefore, we need not consider whether there was sufficient evidence for the court to find by a preponderance of the evidence that the allegations in the petition were true. See *In re Interest of Prince R.*, 308 Neb. 415, 426, 954 N.W.2d 294, 302 (2021) ("in order for a juvenile court to assume jurisdiction of minor children under § 43-247(3)(a), the State must prove the allegations of the petition by a preponderance of the evidence"). Rather, Crystal's sole assignment of error is that the juvenile court erred in ordering continued temporary custody of Diamond by the Department.

We first note that the portion of the January 5, 2021, order which adjudicated Diamond as a child within the meaning of § 43-247(3)(a) due to the faults or habits of Crystal, was a final, appealable order. See *In re Interest of Keisha G.*, 21 Neb. App. 472, 840 N.W.2d 562 (2013) (adjudication and disposition orders are final appealable orders). However, as we stated above, Crystal challenges only the portions of the order pertaining to custody, and we must therefore consider whether these custody provisions are likewise appealable.

In a juvenile case, as in any other appeal, before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it. *In re Interest of Victor L.*, 309 Neb. 21, 958 N.W.2d 413 (2021).

Neb. Rev. Stat. § 25-1902 (Cum. Supp. 2020) authorizes appeals from four types of final orders: (1) those affecting a substantial right in an action that, in effect, determines the action and prevents a judgment; (2) those affecting a substantial right made during a special proceedings; (3) those affecting a substantial right made on a summary application in an action after judgment is rendered; and (4) those denying a motion for summary judgment when such motion is based on the assertion of sovereign immunity or the immunity of a government official. *In re Interest of Victor L., supra.*

A proceeding before a juvenile court is a special proceeding for appellate purposes. *Id.* Therefore, in order to determine whether the January 5, 2021, temporary custody order is a final order, we must determine whether the order affected a substantial right. The determination of appealability in this case, as in other juvenile cases, is a fact-intensive inquiry. See *In re Interest of Zachary B.*, 299 Neb. 187, 907 N.W.2d 311 (2018).

A substantial right is an essential right, not a mere technical right. *In re Interest of Kamille C. & Kamiya C.*, 302 Neb. 226, 922 N.W.2d 739 (2019). Custody is generally considered an essential legal right implicating a parent's fundamental, constitutional right to raise his or her child, but the duration of a court's order is also relevant to whether an order affects a substantial right. *Id.* It is not enough that the right itself be substantial; the effect of the order on that right must also be substantial. *Id.* Whether the effect of an order is substantial depends on whether it affects with finality the rights of the parties in the subject matter. *In re Interest of Zachary B., supra.* "Most fundamentally, an order affects a substantial right when the right would be significantly undermined or irrevocably lost by postponing appellate review." *Tilson v. Tilson*, 299 Neb. 64, 71, 907 N.W.2d 31, 37 (2018).

In juvenile court cases, whether an order affects a substantial right of a parent is dependent upon both the object of the order and the length of time over which the parent's relationship with

the juvenile may be reasonably expected to be disturbed. See *In re Interest of Becka P. et al.*, 296 Neb. 365, 894 N.W.2d 247 (2017). Orders which temporarily suspend a parent's custody, visitation, or education rights for a brief period of time do not affect a substantial right and are therefore not appealable. *Id.*

This case is analogous to *In re Interest of Darryn C.*, 295 Neb. 358, 888 N.W.2d 169 (2016), wherein a grandmother filed for custody of a minor child after the child's parents relinquished their parental rights. The juvenile court overruled the grandmother's motion and ordered that home studies be conducted. The grandmother appealed, but the Nebraska Supreme Court determined there was not a final, appealable order. The court held that the proper inquiry was whether the court's order overruling the grandmother's motion for custody clearly eliminated her ability to gain custody of the minor child at some point in the future. The Supreme Court further stated:

> Although at first glance the order here appears to affect [the grandmother's] right to custody, upon further inspection, it becomes clear that the order does not diminish [her] ability to obtain placement or custody. Instead, the order mandates that DHHS conduct a home study of [her] homes and sets a "Home Study Check" hearing to occur approximately 1 month later, which indicates that the court is still considering [the grandmother] for some type of placement and that the issue of custody will be disposed of within a reasonable amount of time. This finding is supported by the [court's] statements from the bench[.]

*Id.* at 367-68, 888 N.W.2d at 176. The Supreme Court dismissed the appeal for lack of jurisdiction because the juvenile court's order was not a final, appealable order. But cf. *In re Interest of Becka P. et al., supra* (order was not temporary and therefore was appealable because neither language of order nor court's remarks on record denoted temporary interruption of parental rights).

In the present case, the juvenile court's January 5, 2021, order stated that "the minor child shall remain in the temporary care and custody of [the Department] until further order of the court." The court further ordered that a predisposition evaluation be conducted by the Department and set a disposition hearing for February 10, 2021, approximately 30 days later.

In addition, the court commented from the bench that "there's work to be done" with respect to the relationship between Crystal and Diamond, but the court did not yet "know what can be repaired and what can't be repaired." The court further asked Diamond if she understood that "at some point I may order you to [have contact with Crystal]," to which Diamond stated she understood. Finally, the court stated: "So we come back in a month, and I want to figure out . . . I want to know from [Diamond's therapist] what's the best case for this family moving forward."

We conclude that both the temporary custody order and the associated comments at the adjudication hearing make it clear that the juvenile court intended the January 5 order to be temporary in nature and that it planned to revisit the issue of Diamond's placement at the February 10 disposition hearing. Because the January 5 order did not completely dispose of the custody issue and was only temporary in nature, it did not substantially affect Crystal's right to custody and/or placement of her daughter, and it was not a final order under § 25-1902(1)(b).

CONCLUSION

Because the January 5, 2021, order was not final as to custody and placement of the minor child, we do not have jurisdiction over the issues raised in this appeal. Accordingly, we dismiss the appeal for lack of jurisdiction.

APPEAL DISMISSED.