Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
05/07/2021 08:12 AM CDT

In re Interest of Prince R., a child
under 18 years of age.
State of Nebraska, appellee, v. Mohamed K.,
appellant, and Abak R., appellee
and cross-appellant.

___ N.W.2d ___

Filed February 12, 2021.    No. S-20-342.

1. **Juvenile Courts: Evidence: Appeal and Error.** Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings; however, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over the other.
2. **Parental Rights.** The purpose of the adjudication phase is to protect the interests of the child.
3. **Juvenile Courts: Jurisdiction.** To obtain jurisdiction over a juvenile at the adjudication stage, the court's only concern is whether the conditions in which the juvenile presently finds himself or herself fit within the asserted subsection of Neb. Rev. Stat. § 43-247 (Reissue 2016).
4. **Juvenile Courts: Jurisdiction: Proof.** At the adjudication stage, in order for a juvenile court to assume jurisdiction of minor children under Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016), the State must prove the allegations of the petition by a preponderance of the evidence.

Appeal from the Separate Juvenile Court of Lancaster County: Linda S. Porter, Judge. Affirmed.

Robert Wm. Chapin, Jr., of Chapin Law Office, for appellant.

Patrick F. Condon, Lancaster County Attorney, and Maureen E. Lamski for appellee State of Nebraska.

Mona L. Burton, of Anderson, Creager & Wittstruck, P.C., L.L.O., for appellee Abak R.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Papik, J.

The separate juvenile court of Lancaster County adjudicated Prince R. as a child who lacked proper parental care by reason of the fault or habits of his parents, Mohamed K. and Abak R. The juvenile court concluded that the parents failed to ensure that Prince received necessary medical care after he was diagnosed with a rare form of cancer. Mohamed appealed and Abak cross-appealed this determination, but, for reasons we will explain, we affirm.

## BACKGROUND

*Adjudication Petition and*
*Preliminary Motions.*

The State commenced this action on October 21, 2019. In its adjudication petition, the State alleged that Prince, who was born in August 2015, lacked proper parental care by reason of the fault or habits of both Mohamed and Abak. The State asserted that Prince had been diagnosed with alveolar rhabdomyosarcoma of the right forearm with local metastases to the axillary lymph nodes; that the condition was curable with regular chemotherapy and radiation; that without treatment, the condition would be fatal; that Mohamed and Abak, having been informed of Prince's diagnosis and prognosis, intentionally kept him from receiving treatment; and that the actions of Mohamed and Abak placed Prince at a risk of harm.

On the same day the State filed its petition, it filed an ex parte motion for immediate custody of Prince. The juvenile court granted the State's motion. The court later granted motions by the State for Prince to remain in the temporary legal and physical custody of the Nebraska Department of Health and Human Services (DHHS).

*Adjudication Hearing.*

The juvenile court held a trial on the State's adjudication petition over the course of 4 days in January and February 2020. A summary of the evidence presented follows.

Melissa Acquazzino, a board-certified physician who specializes in treating children with cancer at Children's Hospital and Medical Center (Children's) in Omaha, Nebraska, first saw Prince when he came to Children's in July 2019 with a tumor on his right forearm. Following a biopsy, Acquazzino and others on a pediatric pathology team diagnosed Prince with alveolar rhabdomyosarcoma, a form of cancer. It was later determined that the cancer had spread to the lymph nodes of Prince's armpit. Acquazzino testified that there are only about 350 patients diagnosed with this form of cancer in the United States per year.

Acquazzino informed Mohamed and Abak of Prince's diagnosis. She also informed Mohamed and Abak that Prince would need to receive chemotherapy. Acquazzino recalled that Mohamed and Abak were "distraught." She testified that Mohamed expressed anger at the length of time it took to make the diagnosis as well as a belief that if Prince had received antibiotics earlier, cancer would not have developed.

After additional testing on the tumor tissue, Prince was determined to have what Acquazzino referred to as "intermediate risk" rhabdomyosarcoma. Acquazzino testified that this meant that Prince had about a 60-percent chance of relapse-free, long-term survival if the best available treatment were provided. According to Acquazzino, the best available treatment in Prince's case would include an initial round of chemotherapy followed by either surgery or radiation and then continued chemotherapy for a total treatment duration of about 66 weeks. She testified that an international consortium of children's hospitals to which Children's belonged recognized this course of treatment as the best available and that any other hospital within that consortium would have recommended the same treatment. If Prince did not receive this treatment,

Acquazzino said that he would die in 6 months to a year. Acquazzino testified that when patients have a very poor prognosis even if the standard treatment is provided, Children's will offer the option of palliative "comfort care," which is expected to end in the patient's death. Acquazzino testified that was not an option explored in this case given Prince's prognosis.

On July 23, 2019, Acquazzino and Christina Chesters, a social worker at Children's, met with Mohamed and Abak regarding Prince's prognosis and next steps. Acquazzino testified that she outlined the recommended treatment and informed Mohamed and Abak that most patients with Prince's condition will respond to the treatment and achieve long-term survival. Acquazzino also testified that she told Mohamed and Abak that the treatment could involve side effects, which could be managed with medication. Mohamed and Abak also received various printed materials explaining the treatment and possible side effects.

According to Acquazzino, Mohamed and Abak expressed concern at the July 23, 2019, meeting, about the need for chemotherapy. Acquazzino perceived Mohamed and Abak as resistant to the recommended treatment. After Acquazzino told them that this was the best available treatment and that, without treatment, Prince would die, Mohamed and Abak agreed to proceed. Prince began the recommended treatment that night.

Acquazzino testified that Prince's treatment went well initially. His tumor visibly shrank, his side effects were minimal, and he made it to all his appointments. Chesters worked with Mohamed to identify and eliminate any barriers to regular attendance at treatment. As part of that effort, she made financial resources available to pay for car repairs and other bills Mohamed and Abak reported having trouble paying.

After several weeks of treatment, Prince began to experience expected side effects such as nausea, vomiting, and fatigue. Then, in September 2019, Prince started missing some of his scheduled chemotherapy appointments. Chesters testified

that she contacted Mohamed after Prince missed one appointment and that Mohamed told her he believed the doctors were giving Prince too much medicine too quickly. According to Chesters, she emphasized to Mohamed that it was very important Prince receive the treatments as scheduled and that the appointments were not optional. The missed appointments were concerning to Acquazzino, because they could lead to the cancer building resistance to the treatment regimen.

The treatment plan called for Prince to begin radiation treatments while continuing chemotherapy in early October 2019. Concerned about the prior missed chemotherapy appointments and whether Mohamed and Abak would bring Prince to the radiation appointments, Acquazzino asked to meet with Mohamed and Abak on October 1, 2019.

Both Mohamed and Abak attended the October 1, 2019, meeting with Acquazzino and Chesters. The meeting lasted about an hour. Acquazzino recalled that, at the meeting, Mohamed and Abak said Prince was being given too much medicine and that Mohamed said the cancer would not kill Prince, but the chemotherapy would. Mohamed and Abak asked that Prince be given less medicine. Acquazzino explained to them that reducing the medication would expose Prince to the same side effects, but would not be as effective at treating the cancer. She also told them that skipping scheduled treatments could lead to the cancer building resistance and becoming more difficult to treat.

Acquazzino testified that during the meeting on October 1, 2019, Mohamed and Abak said that they wanted to get a second opinion. While Acquazzino and Chesters offered to help facilitate a second opinion by making a referral or sending records to another provider, they also emphasized that the situation was time sensitive, so any second opinion would need to be obtained quickly. Acquazzino testified that while any delay in treatment was not ideal, she would have "tolerated maybe a one to two week delay" to get a second opinion because the benefits of improving the relationship with Mohamed and

Abak would counter the risk of delaying treatment. According to Acquazzino, Mohamed and Abak did not ask for a referral and said they had to think and talk about whether they were interested in one.

Acquazzino testified that for much of the meeting on October 1, 2019, Mohamed and Abak expressed opposition to beginning radiation treatment. By the end of the meeting, however, Mohamed and Abak committed to bringing Prince to his radiation appointment the next day. After the meeting, Acquazzino and Chesters decided to make a Child Protective Services referral. Acquazzino felt that a referral was appropriate because, based on the discussion at the meeting, she was concerned that Mohamed and Abak would not ensure that Prince continued to receive treatment.

Prince did attend his radiation appointment on October 2, 2019. After that, however, neither parent brought Prince to any further radiation or chemotherapy appointments.

On October 2, 2019, Vildana Parmer, a caseworker at DHHS, was assigned to investigate the concerns expressed in the Child Protective Services referral. Parmer had access to several possible addresses in Lincoln, Nebraska, for Mohamed and Abak and initially tried to make contact with them at those locations. These efforts were unsuccessful, but Parmer did reach Mohamed by telephone on October 4. She testified that she asked Mohamed where Prince and Abak were and that Mohamed told her they were at one of the addresses she already visited. After Parmer informed Mohamed that she had recently visited that address and no one was there, Mohamed told her that Abak and Prince were residing at the People's City Mission (PCM). Parmer then visited PCM and asked an employee there to provide her business card to Abak.

Deanna Borg, an employee of PCM, testified that PCM records showed that Abak and Prince began residing at PCM on August 1, 2019. Borg testified that in early October, someone from DHHS asked her to provide Abak with the DHHS employee's business card. Borg provided Abak with the

card and told her that the DHHS employee said that it was important that Abak contact her. After providing the business card, Borg did not see Abak and Prince again. Borg testified that those people staying at PCM are required to sign a paper on their door if they intend to spend that night there. Abak last signed the paper on her door on October 1.

Parmer later found Mohamed outside his residence in Lincoln. She testified that she asked Mohamed where Prince was and that Mohamed initially said that Abak and Prince went to Utah, but later stated they were in Arizona. He said that they went there to seek a second opinion for Prince's medical treatment. Parmer testified that she asked Mohamed to have Abak call her, but Abak never did. Parmer also testified she emphasized to Mohamed that it was important Prince receive his medical treatment and that if he did not receive it, he would likely die. According to Parmer, Mohamed expressed disagreement with that statement.

Patrick Wingfield, an officer with the Lincoln Police Department, attempted to locate Abak, beginning on October 8, 2019. Wingfield found Mohamed outside his residence in Lincoln and requested that Mohamed ask Abak to contact him. Mohamed told Wingfield that Abak had taken Prince to Arizona to get a second opinion for his medical treatment. Wingfield testified that Mohamed told him that this was none of his concern and that Prince was safe.

Luis Herrera, an investigator with the Lincoln Police Department, began attempting to locate Abak and Prince on October 9, 2019. Herrera first attempted to contact Abak via text message and by contacting other police departments. On October 12, he reached Mohamed by telephone. Mohamed told Herrera that Abak and Prince were in Arizona to get a second opinion for Prince's medical treatment. Herrera testified that Mohamed told him, based on his research, Prince was being given too much medication and that Mohamed said, if he disagreed with the medication being given, "he would step in and correct the doctor."

After other attempts to locate Abak and Prince were unsuccessful, Herrera initiated an emergency "ping" on a cell phone number belonging to Abak on October 18, 2019. The ping indicated that the cell phone was in Murfreesboro, Tennessee.

Herrera then called Mohamed again. Mohamed indicated he had been in contact with Abak. Herrera asked that Mohamed facilitate contact between Herrera and Abak. Herrera testified that during this conversation, Mohamed complained about the treatment Prince was receiving through Children's and stated that Children's had a "clandestine agenda."

A few hours after his conversation with Mohamed, Herrera spoke to Abak on the telephone. During the call, Herrera asked Abak whether Prince was receiving medical treatment, but Abak said she did not want to discuss that. When Herrera asked whether Abak and Prince were still in Nebraska, Abak said she was not and would not be coming back. She also said that "if I even get another doctor, it's not going to be in Nebraska."

Herrera acquired a warrant to obtain an ongoing ping on Abak's cell phone. Those pings indicated that the cell phone was at an apartment complex in Murfreesboro. After Herrera provided law enforcement in Tennessee with information regarding the case, Tennessee law enforcement found Abak at the apartment complex on October 26, 2019. Herrera worked with child welfare services in Tennessee to ensure that Prince was taken to a hospital as soon as he was found.

No evidence was presented that Prince received any treatment or was seen by any medical professionals between October 2 and 26, 2019. No evidence was presented that Mohamed or Abak had arranged for another medical professional to provide a second opinion. Chesters testified that although she compiled Prince's medical records in response to Mohamed's request in an October 8 email, she also told Mohamed that he would need to pick up a disc containing the records and that he failed to do so.

Prince, in the temporary custody of DHHS, resumed treatment through Children's once he returned to Nebraska.

Although Acquazzino could not say with certainty to what extent the delay in treatment affected Prince's prognosis, she testified that, in general, delays increase the risk of relapse and decrease the overall efficacy of the treatment. Acquazzino also testified that because chemotherapy can cause blood counts to drop severely, Prince was placed at risk by not having blood tests run on a weekly basis. In addition, she testified that because Prince was receiving chemotherapy and had a central line inserted in his body, Prince was at risk for infection.

Mohamed testified at trial. He agreed that after beginning chemotherapy, Prince's tumor noticeably shrank. He testified that when Prince began experiencing side effects, it was difficult to get him to take the oral medications that would help manage them. He testified that he asked the doctors if Prince could take the medications used to manage side effects in some other way. At one point in his testimony, Mohamed said that he only wanted a second opinion regarding Prince's wrist, which had limited functionality after the biopsy, and that he never wanted a second opinion about the treatment protocol. Later in his testimony, however, he testified that he also wanted to get a second opinion for Prince's cancer diagnosis.

Mohamed testified that he and Abak were not and had never been married. He testified that while Prince resided with Abak at the time of the events at issue, Prince had lived with him at earlier points in his life. Mohamed testified that it was Abak's decision to leave Nebraska. He testified that he did not ask Abak to return because he believed she was seeking a second opinion.

Mohamed disagreed with Chesters' testimony that he did not obtain the medical records, claiming that she emailed the records to him. He conceded that he never gave the records to another medical provider.

Mohamed denied ever telling anyone that the treatment would kill Prince, but the cancer would not. He also denied ever saying that he intentionally did not bring Prince to treatments because he believed Prince was receiving too much medicine

through chemotherapy. He acknowledged that Acquazzino had informed him that it was harmful to Prince to miss scheduled treatments, and he testified that he believed that was true. He testified that he wanted Prince to receive all of the treatment recommended by Children's.

Abak did not testify at trial.

*Juvenile Court's Adjudication Order.*

The juvenile court found that Prince lacked proper parental care by reason of the fault or habits of both Mohamed and Abak. In reaching this conclusion, the juvenile court emphasized various points. It observed that there was no medical evidence presented disputing Acquazzino's opinions concerning Prince's diagnosis or that there was a standard treatment provided for patients with such a diagnosis. It also credited Acquazzino's opinion that Prince had a 60-percent chance of survival with the standard treatment, but would die without it, and that if Prince's treatment was interrupted or delayed, it would increase the risk of relapse and decrease the treatment's efficacy. It noted that neither parent raised a religious or cultural objection to the treatment Prince was receiving.

The juvenile court also considered and rejected both parents' argument that they withdrew Prince from treatment only to obtain a second opinion. It found that the parents' "more likely motivation in removing Prince from the state was to stop his treatment altogether for an undetermined period of time." The juvenile court specifically noted that it found unconvincing Mohamed's testimony that he deferred to Abak in removing Prince from the state and that he lacked knowledge of Abak's "efforts or lack thereof in seeking a second opinion."

Mohamed appealed, and Abak cross-appealed.

## ASSIGNMENTS OF ERROR

Mohamed assigns that the juvenile court erred by finding (1) that Prince lacked proper parental care by reason of his faults or habits and (2) that his actions placed Prince at a

definite risk of harm. On cross-appeal, Abak assigns that the juvenile court erred by making the same determinations with respect to her.

## STANDARD OF REVIEW

[1] Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings; however, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over the other. *In re Interest of A.A. et al.*, 307 Neb. 817, 951 N.W.2d 144 (2020).

## ANALYSIS

*Background Regarding Adjudication*
*Proceedings in Juvenile Court.*

[2,3] Before addressing Mohamed's and Abak's arguments, we briefly review the standards governing the adjudication phase of a juvenile court proceeding. The purpose of the adjudication phase is to protect the interests of the child. *In re Interest of Justine J.*, 286 Neb. 250, 835 N.W.2d 674 (2013). To obtain jurisdiction over a juvenile at the adjudication stage, the court's only concern is whether the conditions in which the juvenile presently finds himself or herself fit within the asserted subsection of Neb. Rev. Stat. § 43-247 (Reissue 2016). *In re Interest of Justine J., supra.*

Section 43-247(3)(a) sets forth numerous grounds by which the juvenile court could take jurisdiction over a juvenile. See *In re Interest of Jeremy U. et al.*, 304 Neb. 734, 936 N.W.2d 733 (2020). The ground relevant to this case is that the juvenile "lacks proper parental care by reason of the fault or habits of his or her parent, guardian, or custodian." See § 43-247(3)(a). As we have previously explained, "proper parental care" includes

> providing a home, support, subsistence, education, and other care necessary for the health, morals, and well-being of the child. . . . It commands that the child not

be placed in situations dangerous to life or limb, and not be permitted to engage in activities injurious to his health or morals.

*State v. Metteer*, 203 Neb. 515, 520, 279 N.W.2d 374, 377 (1979). See, also, *In re Interest of Jeremy U. et al., supra*.

In considering whether a juvenile lacks proper parental care, our case law has incorporated a risk of harm component. *In re Interest of Jeremy U. et al., supra*. To show that a juvenile lacks proper parental care, the State is not required to prove that the child has actually suffered physical harm, but the State must establish that, without intervention, there is a definite risk of future harm. See *In re Interest of Kane L. & Carter L.*, 299 Neb. 834, 910 N.W.2d 789 (2018).

We recently explained in *In re Interest of Jeremy U. et al.* that a claim under § 43-247(3)(a) that a juvenile "lacks proper parental care by reason of the fault or habits of his or her parent, guardian, or custodian" should be analyzed through a two-step inquiry:

The first step is to determine if the juvenile is lacking proper parental care, whether such care is being provided by a parent, a guardian, or a custodian. If a juvenile is not lacking that type of care (and . . . there is no definite risk of harm), adjudication under this provision of § 43-247(3)(a) is improper. If, on the other hand, the juvenile is lacking such care, the court should proceed to the second step: Does that condition result from the fault or habits of the juvenile's parent, guardian, or custodian? If the answer to that question is also yes, then the juvenile court should take jurisdiction of the juvenile and proceed to a proper disposition.

304 Neb. at 748, 936 N.W.2d at 744-45.

[4] At the adjudication stage, in order for a juvenile court to assume jurisdiction of minor children under § 43-247(3)(a), the State must prove the allegations of the petition by a preponderance of the evidence. *In re Interest of Heather R. et al.*, 269 Neb. 653, 694 N.W.2d 659 (2005). A preponderance of

the evidence is the equivalent of the greater weight of the evidence, which means evidence sufficient to make a claim more likely true than not true. See *In re Interest of Vladimir G.*, 306 Neb. 127, 944 N.W.2d 309 (2020). Both Mohamed and Abak argue on appeal and cross-appeal that the State failed to carry its burden to show that Prince lacked proper parental care by reason of their faults or habits and that, without intervention, Prince faced a definite risk of future harm. We turn to their arguments now, beginning with Abak's.

*Abak's Cross-Appeal.*

Abak contends that Prince did not lack proper parental care by reason of her fault or habits and that Prince did not face a definite risk of future harm. In support of her argument that Prince received adequate parental care, Abak primarily emphasizes evidence of her care for Prince prior to the meeting at Children's on October 1, 2019. She mentions, for example, that she noticed the swelling in Prince's forearm and arranged for him to be seen by doctors. She points out that she agreed to the treatment plan recommended by Children's and that Prince initially received treatment as recommended. She also directs us to a note recorded by Chesters in July 2019 stating that she and Mohamed "love Prince very much." But even if this evidence tends to show that Abak was ensuring that Prince received adequate medical care for a period of time, it fails to address the crux of the State's case: that in early October, Abak took Prince out of Nebraska and, for more than 3 weeks until the State was able to locate them, kept Prince from receiving the treatment Acquazzino testified was essential to his survival.

The closest Abak comes to providing an explanation for her actions after the October 1, 2019, meeting are suggestions that she was not refusing to allow treatment, but merely seeking a second opinion. This claim might have more force if there were evidence in the record that Abak had actually made arrangements to obtain a second opinion or taken

significant, concrete steps toward doing so. But even though Acquazzino had recently informed Mohamed and Abak that Prince's condition was serious, that delays in treatment subjected Prince to risk of lethal harm, and that thus, any second opinion must be obtained quickly, there is no evidence that even after Prince had already missed approximately 3 weeks of scheduled treatment, Abak had so much as begun to identify where she might obtain a second opinion. Further, Abak's comment to Herrera that "*if* I even get another doctor, it's not going to be in Nebraska," suggests that Abak had no immediate intentions of arranging for a second opinion. (Emphasis supplied.) Based on this evidence, we agree with the juvenile court that it is more likely than not that Abak did not leave Nebraska with Prince to obtain a second opinion, but to stop his treatment altogether for an indefinite period of time. We also agree with the juvenile court that the decision to indefinitely stop treatment, which Acquazzino testified was essential to Prince's survival, deprived Prince of proper parental care by reason of the faults or habits of Abak.

Abak also argues that the juvenile court erred by finding that, without intervention, Prince faced a definite risk of future harm. Here, Abak argues that because the State could not definitively show that Prince was harmed by not receiving treatment during the time in which she and Prince were not in Nebraska, it did not prove the risk of harm element. Abak's argument, however, is an attempt to transform the risk of harm requirement into a requirement that the juvenile suffer actual harm before the juvenile court obtains jurisdiction. As we have emphasized on many occasions, however, the Nebraska Juvenile Code does not require a juvenile court to wait until disaster has befallen a minor child before the court may acquire jurisdiction. See, e.g., *In re Interest of Justine J.*, 286 Neb. 250, 835 N.W.2d 674 (2013).

The State introduced evidence showing that Prince was placed at risk of harm by a delay in treatment. As we have noted, Acquazzino testified that treatment delays increase

the risk of relapse and decrease the overall efficacy of the treatment and that if the treatment was stopped altogether, Prince would die. Her testimony also established that due to his treatment and the central line in his body, Prince needed to be regularly seen by medical professionals. We find the State established that, without intervention, there was a definite risk of future harm to Prince as a result of Abak's actions.

Under the two-step analysis set forth in *In re Interest of Jeremy U. et al.*, 304 Neb. 734, 936 N.W.2d 733 (2020), the State established that Prince lacked proper parental care and faced a definite risk of future harm and that this resulted from the fault or habits of Abak. We thus find no merit to Abak's cross-appeal.

*Mohamed's Appeal.*

In his appeal, Mohamed makes many of the arguments made by Abak. Like Abak, he contends that he ensured Prince received the treatment recommended by Children's up until early October 2019 and that the treatment stopped at that point only because a decision was made to obtain a second opinion. He also makes the argument that because the State did not prove that Prince actually suffered harm because of the treatment delay, it did not establish the risk of harm element. As we have already explained, however, we are unpersuaded by these arguments. We have already determined under the first step of the two-step *In re Interest of Jeremy U.* analysis that, after his treatment was stopped in early October 2019, Prince lacked proper parental care and, as a result, faced a definite risk of future harm.

Mohamed does make one argument, however, that remains unaddressed even after our analysis of Abak's cross-appeal: Mohamed attempts to place any blame for a lack of parental care exclusively on Abak. Mohamed argues that while he agreed that a second opinion should be sought, he believed Abak was, in fact, seeking such an opinion when she left the state with Prince in October 2019. Although he does not

frame the argument in these exact terms, Mohamed appears to argue that even if the State proved at step one of the *In re Interest of Jeremy U.* analysis that Prince lacked proper parental care and faced a definite risk of future harm because of the treatment delay in October 2019, it did not prove at step two that this was a result of the fault or habits of Mohamed.

As noted above, the juvenile court rejected this argument, finding that both parents made the decision to withdraw Prince from treatment and to remove him from Nebraska—not to obtain a second opinion but to stop his treatment altogether for an undetermined period of time. We agree that, based on the evidence in the record, it is more likely than not that Mohamed supported and bears responsibility for the decision to remove Prince from treatment indefinitely regardless of whether a second opinion was sought. Several pieces of evidence inform this conclusion, which we outline below.

Initially, we note that the record contains evidence of multiple statements by Mohamed that the recommended treatment was not only unnecessary to Prince's survival, but harmful to him. Acquazzino, Chesters, Parmer, and Herrera all testified that Mohamed made such statements. Although the fact that Mohamed made these statements alone would not demonstrate that Prince lacked proper parental care by reason of the fault or habits of Mohamed, they do suggest that Mohamed disagreed with and wanted to discontinue the recommended treatment and was not merely an unwitting victim of Abak.

There are also pieces of evidence that, when considered together, undermine Mohamed's claims that he wanted to obtain a second opinion, that he deferred to Abak to arrange for such an opinion, and that he believed that such an opinion was being sought. First, Mohamed offered testimony regarding his devotion and attachment to Prince. The juvenile court found this testimony credible, observing that Mohamed "undoubtedly loves his son." But while there is no dispute that Mohamed cared deeply for Prince, there is evidence suggesting that he would not have trusted Abak to ensure that Prince

received needed medical care. Mohamed and Abak reported to Chesters that "they don't always get along." In addition, in a meeting with Chesters, Mohamed shared that he was concerned about Abak's arrest record and drug and alcohol use and that he believed her drug usage might explain why Prince missed several speech therapy appointments. During that meeting, Mohamed requested that all appointments be made on days on which he did not have to work. Given Mohamed's attachment to Prince and his prior concerns regarding Abak's reliability, it is difficult to believe that Mohamed entrusted Abak with the task of obtaining a second opinion.

Mohamed emphasizes that he sent an email to Chesters on October 8, 2019, asking that Prince's medical records be compiled so that a second opinion could be sought. This evidence does not persuade us that Mohamed bears no responsibility for the lack of proper parental care. Chesters testified that while she compiled the records, she also informed Mohamed he would need to arrange to come pick up a disc containing the records, and he never did so. Mohamed disagreed with this testimony, claiming that Chesters emailed the records to him. But even assuming the truth of Mohamed's testimony on this point, Mohamed also testified that he never sent the records to another medical provider. The assertion that Mohamed believed a second opinion was being obtained is difficult to square with the fact that he knew the records necessary to obtain such an opinion had not been given to another provider.

We acknowledge that Mohamed testified that he believed Abak was arranging for a second opinion and that Abak told him she had made an appointment with another provider. The juvenile court, however, found Mohamed's "claimed ignorance of [Prince's and Abak's] whereabouts, or [Abak's] efforts or lack thereof in seeking a second opinion, unconvincing." The juvenile court had the opportunity to observe Mohamed's testimony firsthand, and given the evidence in the record we have discussed, we believe deference to its assessment of the credibility of Mohamed's claims is warranted. See *In re*

*Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020).

Based on the foregoing, we agree with the juvenile court that it is more likely than not that Mohamed supported Abak's taking Prince from the state because he too wanted the treatment stopped indefinitely and did not want Prince to be found. We thus reject Mohamed's argument that the State failed to prove at step two of the analysis under *In re Interest of Jeremy U. et al.*, 304 Neb. 734, 936 N.W.2d 733 (2020), that Prince lacked proper parental care because of Mohamed's fault or habits.

## CONCLUSION

We find that the juvenile court did not err by adjudicating Prince as a child that lacked proper parental care by reason of the fault or habits of both Mohamed and Abak. Accordingly, we affirm.

Affirmed.