IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF JONATHON G.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF JONATHON G., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

ABDUL R., APPELLANT


Filed November 16, 2021.   No. A-21-345.


Appeal from the Separate Juvenile Court of Douglas County: CANDICE J. NOVAK, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Yvonnda A. Summers for appellant.

Shinelle Pattavina, Deputy Douglas County Attorney, and Zachary Severson, Senior Certified Law Clerk, for appellee.


PIRTLE, Chief Judge, and RIEDMANN and WELCH, Judges.

WELCH, Judge.

### INTRODUCTION

Abdul R. appeals from the order of the Douglas County Separate Juvenile Court adjudicating his son, Jonathon G., as a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). Abdul contends that the juvenile court erred in determining that the State proved, by a preponderance of the evidence, that Jonathon was at risk of harm due to his medical condition and that Abdul's failure to supervise Jonathon in taking his medication amounted to neglect or refusing to care for Jonathon's medical needs. For the reasons set forth herein, we affirm.

STATEMENT OF FACTS

### BACKGROUND

At the time of Jonathon's birth in 2006, he was diagnosed with Bartter Syndrome. Bartter Syndrome is a kidney disorder which affects normal kidney functioning and, without treatment, places the affected individual at a high risk of cardiac death. In order to treat his condition, Jonathon takes multiple prescriptions and supplements (hereinafter referred to as "medications") amounting to approximately 30 pills a day with scheduled doses at 7 a.m., 3 or 4 p.m., and 10 p.m. If Jonathon fails to comply with taking his medications as prescribed, he is at risk for kidney stones, kidney disease, hypokalemia, and cardiac death. Although Jonathon initially resided with his mother, he has resided with Abdul since approximately August 2, 2017. Jonathon's mother is not a part of this appeal.

During the 3-month period from April to June 2020, while in Abdul's care, Jonathon was hospitalized three times, due to dangerously low potassium levels and doctor's concerns regarding Jonathon's heart rhythm. Prior to Jonathon's third hospitalization in June, lab results showed that Jonathon's potassium levels were at dangerous levels requiring his admission; however, Abdul waited until the following day to take Jonathon to the hospital. During this third hospitalization, Dr. Teri Mauch, Jonathon's treating nephrologist, suspected that Jonathon was not complying with his medication schedule and was not receiving proper medical care or supervision at home. Although Dr. Mauch increased Jonathon's medication dosage due to his weight gain, this change did not affect her opinion that the cause of Jonathon's hospital admission was his noncompliance with treatment. Dr. Mauch reported these concerns to Dr. Suzanne Haney, the hospital's pediatrician specializing in child abuse, and the child abuse hotline/child protective services (CPS).

The following month, in July 2020, the State filed an adjudication petition alleging that Jonathon was a child within the meaning of § 43-247(3)(a). Specifically, the State alleged that

> (A) [Jonathon] is diagnosed with Bartter's Syndrome; (B) [Jonathon] is at risk of death or permanent injury due to lack of medication compliance; (C) Abdul . . . has failed to provide the necessary medical care to include daily required medication for said juvenile's medical condition of Bartter s Syndrome; (D) Abdul . . . has failed to provide for the appropriate care, support, supervision, safety and/or medical care for said juvenile; and (E) For the above reasons said juvenile is at risk for harm.

That same day, Jonathon was removed from Abdul's care, was placed in the care of the Nebraska Department of Health and Human Services (DHHS), and was placed with his grandparents.

Following a hearing in late July 2020, the juvenile court continued custody with DHHS with placement to exclude Abdul's home. The order included additional requirements that Jonathon complete an initial diagnostic interview, complete an IQ assessment, and participate in individual and family therapy. The State was ordered to provide services to Abdul including supervised visitation, an initial diagnostic interview, and family therapy when recommended. The State was also ordered to develop a safety plan by the next status hearing set for early August. At the status hearing, the court ordered that Jonathon's placement could include Abdul's home if Abdul complied with "every aspect of the safety plan." Jonathon transitioned to Abdul's home on

August 16. However, about 1 month later, Jonathon was again admitted to the hospital due to his failure to take his medications. On September 9, Jonathon was removed from Abdul's care due to Abdul's failure to comply with the safety plan including failure to administer and supervise Jonathon while taking his medications as prescribed.

### ADJUDICATION HEARING AND JUVENILE COURT ORDER

The adjudication hearing was held on December 21, 2020, and continued on January 29, February 17, and March 1, 2021. The State's witnesses included Dr. Mauch; Dr. Haney; Jonathon; Tyler Garrity, CPS worker; and See Chang, a home health worker. Abdul did not present any evidence.

Dr. Mauch testified that, as Jonathon's treating nephrologist since 2012, she closely monitors his condition, including his blood testing Jonathon's potassium levels. These blood tests revealed that Jonathon's potassium levels have always varied despite Dr. Mauch's attempts to stabilize them. According to Dr. Mauch, when Jonathon first began treatment, he was receiving his medications through a button which automatically administered his medications; however, upon Jonathon's request, and with the approval of his parents, Jonathon started an oral regimen.

During at least four of Jonathon's appointments, Dr. Mauch personally spoke with Abdul regarding the need to supervise Jonathon's medication compliance due to the high risks associated with noncompliance. Jonathon's medical record showed that other medical professionals in her office had also spoken to Abdul on the same subject. Abdul indicated to Dr. Mauch that he understood but that he wanted Jonathon to be more independent. Dr. Mauch acknowledged Abdul's concern about wanting Jonathon to be more independent and provided him with suggestions but stated that the risks were too high to not supervise Jonathon's medication schedule.

Dr. Mauch stated that during every interaction with Abdul, she discussed with him the importance of supervising Jonathon's medication schedule and the risks associated with failing to do so. As a result, she stated that Jonathon was at serious risk of harm if he continued to receive the same level of supervision in Abdul's home. Drs. Mauch and Haney both testified that the care Jonathon was receiving at Abdul's home was concerning because Jonathon's condition presents a high risk of death.

At some point, after seeing no improvement and after Jonathon had been hospitalized for the third time, Dr. Mauch referred Jonathon for home health care to complete weekly pill counts, blood draws, and to provide parental support. Home health care was provided by several workers including Chang. Chang stated that when Jonathon was first referred to home health care, she had difficulty scheduling appointments with Abdul. Chang stated that multiple workers went out to the home to treat Jonathon, but she saw him most frequently. Although home health workers were occasionally denied access to Abdul's home, Chang stated that she was never personally denied entry. Chang stated that every time she was at Abdul's home, Jonathon's pill counts were off, meaning that there were more pills than what there should have been if Jonathon was complying with his medication schedule. Chang testified that she attempted to express concerns with Abdul including his need to supervise Jonathon's medication compliance and the risks of noncompliance, but that Abdul would either not respond or would walk away. Additionally, Chang stated that at least on one occasion, Jonathon did not have his medication at all. Jonathon stated that Abdul told

him not to take his medication after one of the home health workers counted the pills without gloves. In response, Dr. Mauch stated that all the home health care reports stated that workers wore gloves during each visit and that Abdul never requested a refill for the medications that were allegedly thrown away due to the worker counting pills without gloves. When asked by Abdul's counsel if she was aware Medicaid had denied a refill request, Dr. Mauch responded that she was not aware, but that Abdul never contacted her to inform her of any such issue.

According to Dr. Mauch, during the last year when Jonathon had lived with Abdul, Jonathon's potassium levels had dropped significantly resulting in three hospitalizations. During at least two of those hospitalizations, Jonathon had abnormal heart rhythms which concerned Dr. Mauch because of Jonathon's increased risk of cardiac death. Dr. Mauch noted that after being admitted to the hospital, Jonathon's potassium level rose substantially within 24 hours, leading her to believe that Jonathon was not taking his medications as prescribed. Dr. Mauch also noted that prior to his blood work, Jonathon would take more medication, causing an overcorrection which she stated could be even more dangerous to Jonathon's health.

As a result of the concerns with Jonathon's medical care at Abdul's home and the three hospital admissions, Dr. Mauch contacted CPS and Dr. Haney. Dr. Haney met with Jonathon who stated that he did not like to take his medications and would not take them unless he was supervised. Dr. Haney drafted an affidavit indicating that Jonathon was at risk if he continued to remain in Abdul's home due to the lack of supervision over the administration of his medications.

Jonathon testified that Abdul would watch him take his morning medications but did not supervise the afternoon or evening doses because Abdul was either sleeping or working. Further, although Abdul made Jonathon set alarms to take his afternoon and evening medications, Jonathon stated that he ignored the alarms and admitted that he would only take his medications if he was supervised. Both Drs. Mauch and Haney testified that Jonathon cannot be held accountable to take his medications on his own and that he needs supervision to do so. Prior to being removed from Abdul's care, Jonathon reported to Dr. Mauch that he did not care whether he lived or died.

Since being placed with his grandparents, Chang and Dr. Mauch testified that Jonathon's potassium levels have become more stable, he has not been hospitalized, he had not missed any appointments, his pill counts were accurate, and he appeared to be in better spirits. Further, after seeing a therapist referred by Dr. Mauch, Jonathon stated that he feels like his grandparents' home is a better environment for him and he preferred to remain in their care. Jonathon stated that his grandmother supervises him taking his medications and individually hands him each of his pills.

The juvenile court adjudicated Jonathon as a child within the meaning of § 43-247(3)(a) based upon its finding that the State had proved, by a preponderance of the evidence, that returning Jonathon to Abdul's care was contrary to Jonathon's health and safety. Abdul has timely appealed to this court.

## ASSIGNMENT OF ERROR

Abdul contends that the juvenile court erred in finding that Jonathon was a child within the meaning of § 43-247(3)(a) because the evidence was insufficient to establish that Jonathon was at risk for harm.

- 4 -

STANDARD OF REVIEW

Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings; however, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over the other. *In re Interest of Prince R.*, 308 Neb. 415, 954 N.W.2d 294 (2021).

ANALYSIS

Abdul argues that the juvenile court erred in finding that Jonathon was a child within the meaning of § 43-247(3)(a) because the evidence was insufficient to establish that Jonathon was at risk for harm.

Recently, in *In re Interest of Prince R., supra*, the Nebraska Supreme Court restated the law regarding adjudications pursuant to § 43-247(3)(a) based upon the allegation that the minor child lacked proper parental care by reason of the fault or habits of his or her parent, guardian, or custodian:

Section 43-247(3)(a) sets forth numerous grounds by which the juvenile court could take jurisdiction over a juvenile. See *In re Interest of Jeremy U. et al.*, 304 Neb. 734, 936 N.W.2d 733 (2020). The ground relevant to this case is that the juvenile "lacks proper parental care by reason of the fault or habits of his or her parent, guardian, or custodian." See § 43-247(3)(a). As we have previously explained, "proper parental care" includes "providing a home, support, subsistence, education, and other care necessary for the health, morals, and well-being of the child. . . . It commands that the child not be placed in situations dangerous to life or limb, and not be permitted to engage in activities injurious to his health or morals. *State v. Metteer*, 203 Neb. 515, 520, 279 N.W.2d 374, 377 (1979). See, also, *In re Interest of Jeremy U. et al., supra*.

In considering whether a juvenile lacks proper parental care, our case law has incorporated a risk of harm component. *In re Interest of Jeremy U. et al., supra*. To show that a juvenile lacks proper parental care, the State is not required to prove that the child has actually suffered physical harm, but the State must establish that, without intervention, there is a definite risk of future harm. See *In re Interest of Kane L. & Carter L.*, 299 Neb. 834, 910 N.W.2d 789 (2018).

We recently explained in *In re Interest of Jeremy U. et al.* that a claim under § 43-247(3)(a) that a juvenile "lacks proper parental care by reason of the fault or habits of his or her parent, guardian, or custodian" should be analyzed through a two-step inquiry: "The first step is to determine if the juvenile is lacking proper parental care, whether such care is being provided by a parent, a guardian, or a custodian. If a juvenile is not lacking that type of care (and . . . there is no definite risk of harm), adjudication under this provision of § 43-247(3)(a) is improper. If, on the other hand, the juvenile is lacking such care, the court should proceed to the second step: Does that condition result from the fault or habits of the juvenile's parent, guardian, or custodian? If the answer to that question is also yes, then the juvenile court should take jurisdiction of the juvenile and proceed to a proper disposition." 304 Neb. at 748, 936 N.W.2d at 744-45.

At the adjudication stage, in order for a juvenile court to assume jurisdiction of minor children under § 43-247(3)(a), the State must prove the allegations of the petition by a preponderance of the evidence. *In re Interest of Heather R. et al.*, 269 Neb. 653, 694 N.W.2d 659 (2005). A preponderance of the evidence is the equivalent of the greater weight of the evidence, which means evidence sufficient to make a claim more likely true than not true. See *In re Interest of Vladimir G.*, 306 Neb. 127, 944 N.W.2d 309 (2020).

308 Neb. at 425-27, 954 N.W.2d at 301-02.

Nebraska appellate courts have previously affirmed the juvenile court's finding that a child comes within the purview of § 43-247 when a parent failed to properly administer medications as prescribed for a child suffering from a medical condition. See, *In re Interest of Prince R.*, 308 Neb. 415, 954 N.W.2d 294 (2021) (affirming adjudication of child, who suffered from rare form of cancer, as child that lacked proper parental care by reason of fault or habits of both parents based upon parents' decision to indefinitely stop child's treatment which physician testified was essential to child's survival); *In re Interest of Darius A.*, 24 Neb. App. 178, 884 N.W.2d 457 (2016) (affirming adjudication of child as child within meaning of § 43-247(3)(a) due to fault or habits of mother, who admittedly, on numerous occasions, failed to give child, who suffered from various medical conditions, medications as prescribed).

Here, Jonathon testified that he would take his medications if he was supervised, that Abdul did not supervise his medication compliance, and Jonathon ignored alarms set to remind him to take his medications. Despite the fact that Jonathon refused to take his medications unless he was supervised, Abdul either would not, or could not, supervise Jonathon to ensure his medication compliance. Drs. Mauch and Haney agreed that, while living with Abdul, Jonathon's noncompliance with his medications was due to lack of supervision. Abdul's failure to provide medication supervision continued despite numerous healthcare providers emphasizing the importance of supervising Jonathon to maintain his medication schedule and the severe and potentially deadly consequences which could occur if Jonathon was noncompliant in taking his medications. Abdul expressed that he wanted Jonathon to be more independent despite Jonathon's unwillingness or inability to adhere to his medication schedule. While in Abdul's care, home health services often determined that Jonathon's pill numbers were incorrect because he had not been properly taking his medication or, in one instance, he did not have his medication because his prescription had not been refilled. Following our de novo review of the record, we find the evidence established by a preponderance of the evidence that Jonathon lacked proper parental care by reason of Abdul's fault or habits.

Moreover, we also find that the evidence established that not only had Jonathon suffered harm from Abdul's lack of parental care but, without intervention, there was a definite risk of future harm. The evidence was clear that without proper medication, Jonathon was at risk of a potentially fatal cardiac arrest. While in Abdul's care, Jonathon was hospitalized on 3 occasions due to his dangerously low potassium markers and abnormal heart rhythm. In that regard, Dr. Mauch testified that returning Jonathon to Abdul's home would place Jonathon at risk of harm if Abdul continued to provide the same level of medication supervision. We note that after being placed with his grandparents, Jonathon has received appropriate supervision to ensure his

medication compliance. Jonathon's grandmother hands Jonathon his pills one at a time and monitors his compliance with taking those pills. Since being removed from Abdul's care, Jonathon has been compliant in taking his medications, his potassium levels have stabilized to some degree, and he has not been hospitalized. Thus, the record establishes by a preponderance of the evidence that Abdul was at fault due to neglecting or failing to provide medication supervision which caused harm to Jonathon and placed him in imminent danger of future harm.

## CONCLUSION

We find that the juvenile court did not err by adjudicating Jonathon as a child that lacked proper parental care by reason of the fault or habits of Abdul. Accordingly, we affirm.

AFFIRMED.