IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF MALACHI D. ET AL.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF MALACHI D. ET AL., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

TRAVELL R., APPELLANT.


Filed February 10, 2026.    No. A-25-387.


Appeal from the Separate Juvenile Court of Douglas County: CHAD M. BROWN, Judge. Reversed and remanded with directions.

Thomas C. Riley, Douglas County Public Defender, and Ronald C. Betita for appellant.

Donald W. Kleine, Douglas County Attorney, and Daniel Gubler for appellee.


PIRTLE, WELCH, and FREEMAN, Judges.

FREEMAN, Judge.

## INTRODUCTION

Travell R. appeals from the order of the separate juvenile court of Douglas County that adjudicated his daughter Ani'ya W. He argues that the juvenile court erred in finding sufficient evidence that Ani'ya came within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). For the reasons explained below, we reverse the judgment of the juvenile court and remand the cause with directions to dismiss the petition for adjudication.

## BACKGROUND

On November 7, 2024, a petition was filed alleging that Travell's daughter, Ani'ya (born in 2007), was within the meaning of § 43-247(3)(a) because she lacked proper parental care. Specifically, Ani'ya was at risk of harm because Travell had failed to provide for her needs; failed

- 1 -

to provide proper parental care, support, supervision, and/or protection; and failed to provide her safe, stable, and/or appropriate housing. At the time of the adjudication hearing, Ani'ya was 17 years old. The following testimony was adduced at the hearing.

*Caseworker.*

According to the Department of Health and Human Services (DHHS) caseworker, Trip Carlson, DHHS officially placed Ani'ya with Travell in June 2024, after she was removed from her mother's care. Though placed with her mother, Ani'ya had unofficially been living with Travell for several months prior to being officially placed with him. At the time of placement, Carlson found Travell's home to be safe.

For several months after her placement with Travell, Ani'ya would regularly spend weekends away at her friends' homes. Ani'ya would tell Carlson that "I'm not allowed to go back home," but then would return to Travell's home after the weekend.

Around August or September 2024, Carlson became aware that Ani'ya "needed to stay at her placement pursuant to the [separate] 3(A) juvenile case." Carlson then testified that

> [i]t was my belief at the time that it was okay for her to spend a couple nights with a friend if they're appropriate for her probation case and let her know my thoughts about it. She would ask me if it's okay to stay with somebody, and I would tell her that it was fine with me personally, just because in normal, non-court families, that happens all the time.

However, he also stated that

> [i]t had been reported to me that Ani'ya was largely living with her father but that she would go out on – with her friends for several days at a time at some points, some of which I understand she wasn't supposed to be with through her probation, and I know that that was a big point of contention in her probation case as well; that she needed to stay with her father and not be spending a bunch of time outside of the home.

Travell mentioned his concerns with Ani'ya's behavior to Carlson, and Carlson suggested that Travell have Ani'ya undergo an initial diagnostic interview for mental health purposes.

On October 3, 2024, Carlson conducted a home visit where he met with both Travell and Ani'ya and determined that things were going well. Carlson continued to encourage Travell to seek full custody of Ani'ya. Carlson stated that "[t]here was no reason for me to believe that [Ani'ya] hadn't been" living at Travell's house.

On October 11, 2024, Carlson met with Ani'ya at her boyfriend's mother's house. Carlson believed that Ani'ya went back to Travell's house between October 9 and 22, based on messages Carlson received from Ani'ya. However, Carlson never followed up to confirm that Ani'ya had returned to Travell's home.

On October 18, 2024, Carlson was told by Ani'ya's probation officer, Angela Buford, that Ani'ya had not resided with Travell since October 9. That same day, Carlson and his supervisor contacted Travell and told him that he had a legal obligation to provide care for Ani'ya and that she needed to stay with him. Carlson at first stated that Travell told him that Ani'ya was not allowed back home, though Carlson later retracted this statement. Instead, Carlson stated that

Travell requested that Ani'ya be placed in a different home. Carlson denied that any agreement was reached for Ani'ya to return to Travell's home.

On October 29, 2024, Carlson submitted an affidavit for removal. Based on a safety assessment, Carlson determined that Ani'ya would be at risk of harm if she remained in Travell's custody because she was being deserted or abandoned by Travell. Carlson determined that Travell was not allowing Ani'ya in his house and was not providing care for her despite his legal obligation. Carlson claimed that Ani'ya's basic needs for food, shelter, and clothing were not being met.

*Probation Officer.*

Buford testified that in August 2024, Ani'ya was placed on probation. While on probation, Ani'ya was electronically monitored with a "zero curfew," which meant she was restricted to Travell's house or school.

Buford was aware that Ani'ya violated probation. During August and September 2024, Ani'ya would leave Travell's house for one to two nights at a time. To Buford, it appeared that Ani'ya was not at Travell's house very often, and that the constant moves were due to Travell's relationship with Ani'ya. Buford testified regarding her concerns that a lack of a stable living arrangement could make it difficult to track Ani'ya and could make it difficult for Ani'ya to raise her child.

Buford was aware that Carlson was giving Ani'ya permission to stay at other locations. Buford was concerned about where Carlson allowed Ani'ya to stay. At one location, the family friend was very young. At another location, Ani'ya would stay with relatives of her boyfriend with whom she'd previously been in arguments. According to Buford, it was very difficult to supervise Ani'ya because she was constantly moving locations, as approved by her caseworker.

Travell sometimes notified Buford when Ani'ya violated "zero curfew."

Even though Buford testified to these concerns, on September 17, 2024, Buford met with Travell and Ani'ya and determined that things were going well.

However, on October 9, 2024, according to Buford, Travell and Ani'ya argued about transportation to and from school. Based on Buford's understanding, it was Travell's responsibility to transport Ani'ya to school. Whether transportation affected Ani'ya's school attendance was never addressed.

According to Ani'ya's electronic monitor, apart from stopping by Travell's house a few times, Ani'ya did not reside with Travell between October 9 and 21, 2024. After October 21, Ani'ya did not return to Travell's house.

On October 22, 2024, Buford contacted Travell to inform him, for the first time, that Ani'ya had to stay with him. According to Buford, Travell told her that Ani'ya was no longer allowed in his house because she was disrespectful and did not follow his rules. Travell's wife also did not want Ani'ya back home. Travell also told Buford that the person Ani'ya was currently staying with was a "good person."

*Travell.*

Travell testified that he lived with his wife, three of Ani'ya's siblings, and Ani'ya's child. Travell wanted Ani'ya to live with him. Travell claimed there were regular teenager issues in taking care of his daughter, but generally "it was all good." Eventually, Travell began the process of seeking full custody of Ani'ya, but did not finish because he lacked the legal knowledge to complete the process.

Travell and his wife tried to help Ani'ya follow the terms of her probation. Travell admitted that Ani'ya would leave, without his permission, and spend weekends away at her friends' homes. When she left, Travell would contact Ani'ya's electronic monitor program to determine her whereabouts.

Travell testified that Carlson would allow Ani'ya to leave his house without his permission and against the terms of her probation. Specifically, Travell claimed that Carlson gave Ani'ya permission to go over to her boyfriend's mother's house, which was not allowed according to the terms of her probation.

On October 9, 2024, Ani'ya left his house. Travell never told her to leave. He contacted her electronic monitor program and Carlson, but Carlson did not respond.

Travell was asked to describe Ani'ya's school transportation situation. Travell explained he does not drive, so he does not have a car. However, Travell claimed there was a bus stop half a block from his house Ani'ya could take to school for free. According to Travell, Ani'ya wanted to go to school in an Uber every day. Travell's other children received rides to school by his brother and wife, but his family was unable to transport Ani'ya because she went to a charter school that started later in the day while his family was at work. Instead of taking the bus, Ani'ya was able to find rides to school, sometimes with her community youth coach.

Travell confirmed that Ani'ya had not lived with him since October 9, 2024, but she did come back to his house. Travell testified that he did not provide her food or money during this time. But Ani'ya obtained clothes and items for her child from him.

Travell confirmed that his wife did not want Ani'ya back home. He also confirmed that he said Ani'ya was no longer allowed in his house, but he did not mean forever.

Travell stated he was frustrated with how Carlson allowed Ani'ya to leave his house without his permission and against the terms of her probation. Travell did not want Ani'ya in his house if Carlson was going to continue that behavior. He wanted to go to court to address these concerns.

At the conclusion of the conversations with Carlson and Buford, Travell claimed that he reached an agreement with DHHS that Ani'ya could return to his house. He specifically told Carlson that his daughter could return home.

*Juvenile Court's Ruling.*

After the adjudication hearing, the juvenile court found Carlson's and Buford's testimony was "credible, reliable, trustworthy and entitled to weight" and that Travell failed to provide for Ani'ya. Further, the juvenile court found that Ani'ya was within the meaning of § 43-247(3)(a) and would remain in DHHS' custody. Ani'ya was not to be placed with Travell.

Travell appeals.

ASSIGNMENTS OF ERROR

Travell argues that the juvenile court erred in finding sufficient evidence that his daughter was at risk of harm and comes within the meaning of § 43-247(3)(a).

STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Manuel C. & Mateo S.*, 314 Neb. 91, 988 N.W.2d 520 (2023). In a de novo review, an appellate court disregards inadmissible or improper evidence. *In re Interest of Xandria P.*, 311 Neb. 591, 973 N.W.2d 692 (2022). When the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *In re Interest of Denzel D.*, 314 Neb. 631, 992 N.W.2d 471 (2023).

ANALYSIS

The purpose of the adjudication phase is to protect the interests of the child. *In re Interest of Xandria P., supra*. To obtain jurisdiction over a juvenile at the adjudication stage, the court's only concern is whether the conditions in which the juvenile presently finds himself or herself fit within the asserted subsection of § 43-247. *In re Interest of Prince R.*, 308 Neb. 415, 954 N.W.2d 294 (2021).

For a juvenile court to assume jurisdiction of minor children under § 43-247(3)(a), the State must prove the allegations of the petition by a preponderance of the evidence. *In re Interest of Xandria P., supra*. A preponderance of the evidence is the equivalent of the greater weight of the evidence, which means evidence sufficient to make a claim more likely true than not true. *In re Interest of Prince R., supra*. Here, the State argues Ani'ya is within § 43-247(3)(a) because she lacked proper parental care due to the fault of Travell. The State did not allege abandonment. See *In re Interest of Jeremy U. et al.*, 304 Neb. 734, 936 N.W.2d 733 (2020) (finding abandonment was not same as lacking proper parental care and must be separately alleged).

A claim under § 43-247(3)(a) that a juvenile lacks proper parental care by reason of the fault or habits of his or her parent, guardian, or custodian should be analyzed through a two-step inquiry:

> The first step is to determine if the juvenile is lacking proper parental care, whether such care is being provided by a parent, a guardian, or a custodian. If a juvenile is not lacking that type of care (and . . . there is no definite risk of harm), adjudication under this provision of § 43-247(3)(a) is improper. If, on the other hand, the juvenile is lacking such care, the court should proceed to the second step: Does that condition result from the fault or habits of the juvenile's parent, guardian, or custodian? If the answer to that question is also yes, then the juvenile court should take jurisdiction of the juvenile and proceed to a proper disposition.

*In re Interest of Prince R.*, 308 Neb. at 426, 954 N.W.2d at 302 (citing *In re Interest of Jeremy U. et al., supra*).

Proper parental care includes providing a home, support, subsistence, education, and other care necessary for the health, morals, and well-being of the child. *In re Interest of Prince R., supra.*

It commands that the child not be placed in situations dangerous to life or limb, and not be permitted to engage in activities injurious to his health or morals. *Id.*

In considering whether a juvenile lacks proper parental care, our case law has incorporated a risk of harm component. *Id.* To show that a juvenile lacks proper parental care, the State is not required to prove that the child has actually suffered physical harm, but the State must establish that, without intervention, there is a definite risk of future harm. *Id.* In describing risk of harm, the Nebraska Supreme Court has compared it to an "emergency situation" or "imminent" harm. *In re Interest of Anaya*, 276 Neb. 825, 838-39, 758 N.W.2d 10, 21-22 (2008).

To establish a definite risk of future harm, there must be an evidentiary nexus between the allegations of the petition and a definite risk of future harm. *In re Interest of Chloe P.*, 21 Neb. App. 456, 840 N.W.2d 549 (2013). The Nebraska Juvenile Code does not require a juvenile court to wait until disaster has befallen a minor child before the court may acquire jurisdiction. *In re Interest of Prince R.*, 308 Neb. 415, 954 N.W.2d 294 (2021).

We need only address the first step of the inquiry as the State did not provide sufficient evidence that Ani'ya lacked proper parental care due to the fault of Travell. For lack of proper parental care, Carlson claimed that Travell was not meeting Ani'ya's basic needs of food, shelter, and clothing. However, for several months before the adjudication hearing, Ani'ya would leave Travell's home to stay with friends, sometimes for multiple days, without Travell's permission but sometimes with consent from Carlson. Yet, no one claimed that Ani'ya was not receiving a home, support, subsistence, education, and other care necessary for her health, morals, and well-being at the other locations she stayed. And when Ani'ya would not return for multiple days, Travell tracked her whereabouts through her electronic monitor program and sometimes contacted Buford. Travell also indicated that when Ani'ya left his home in October 2024, he tracked her location and knew she was staying with a "good person." At the time Carlson completed his affidavit for removal, Ani'ya was engaged in the same behavior as before, sometimes with Carlson's approval, and there was no evidence to suggest that Carlson was concerned she was not receiving care where she was staying.

Further, not being allowed in Travell's house did not put Ani'ya at a risk of harm. Not residing at a parent's house in itself is not a risk of harm when a child is still receiving care at a different location. See, *In re Interest of Jeremy U. et al.*, 304 Neb. 734, 936 N.W.2d 733 (2020); *In re Interest of Justine J. et al.*, 286 Neb. 250, 835 N.W.2d 674 (2013). In similar opinions where the parent has prevented or did not want a child to return home, we found a separate risk of harm. See, *In re Interest of Te'Jon W.*, No. A-24-077, 2024 WL 4274363 (Neb. App. Sep. 24, 2024) (selected for posting to court website) (finding risk of harm because of parent's drug use); *In re Interest of Daniel C.*, No. A-17-395, 2017 WL 8723880 (Neb. App. Oct. 18, 2017) (selected for posting to court website) (finding risk of harm because children were left with dangerous roommate who used drugs).

Here, there is no evidence of a separate risk of harm. Travell's house was found to be safe by DHHS. The State's case relies on Travell's statements to Buford indicating that Ani'ya was no longer allowed in his house or that Ani'ya should have a different placement as recounted by Carlson.

We note that Travell claimed an agreement was reached with Carlson and his supervisor for Ani'ya to return to his house, although Carlson denied such an agreement existed, claiming

instead that Travell requested a different placement for Ani'ya. Even if we give some weight to the fact that the juvenile court found Carlson's and Buford's testimony credible, we still find the State failed to meet its burden to show Ani'ya was denied proper parental care by Travell.

Regardless of Travell's statements, the State did not provide sufficient evidence as to how Travell's request for a different placement for Ani'ya, or his refusal to allow her to return home, caused her a definite risk of harm. First, Buford offered vague and speculative concerns. Buford claimed that not having a stable place to live could make it difficult to track Ani'ya and for Ani'ya to raise her child. Buford also asserted that some of the places Ani'ya was staying were not good for her, such as one friend was too young for Ani'ya to stay with, and Ani'ya argued with her boyfriend's mother and aunt. However, these claims alone do not prove that Ani'ya was in a situation dangerous to her life.

We also recognize that while the record is limited on the information surrounding Ani'ya's child, according to Travell, Ani'ya had picked up items for her child from his home that he provided. Thus, we assume that Ani'ya had her child with her. We are skeptical of the concerns regarding Ani'ya if no case professional offered concerns regarding the wellbeing of Ani'ya's young child.

Second, Carlson indicated that Ani'ya was at risk of harm if she remained with Travell. Carlson claimed in his affidavit for removal that the risk of harm was due to Travell deserting or abandoning his daughter such that her basic needs of food, shelter, and clothing were not being met. But, as we previously addressed, abandonment was not alleged in the State's petition. See *In re Interest of Jeremy U. et al., supra*. If there were other considerations involved in Carlson's safety assessment, none were presented on the record for our review. Carlson also testified to other instances before October 9, 2024, that Ani'ya claimed she was not allowed at Travell's home but would return after the weekend. We have no evidence that Carlson took any action regarding Ani'ya's previous statements. Carlson only acted after Buford intervened.

Once Carlson and Buford agreed that Ani'ya was required to stay with Travell, little time passed before the State became involved. An affidavit for removal was submitted only 11 days after Carlson's phone call with Travell on October 18, 2024, and a petition was filed 9 days later on November 7.

The only difference in circumstances at the time of the filing of the petition was the extended time Ani'ya was away from Travell's house and Travell's statement that Ani'ya was no longer allowed back in his house. Within this short period of time, the State did not provide evidence of any other change in circumstances that could put Ani'ya at risk of harm. Stated differently, once Carlson changed his position whereby he informed Travell and Ani'ya that Ani'ya had to reside with Travell in his home, the State provided very little time for Travell to work with Ani'ya and Carlson to accommodate the newly issued directive. Travell indicated his reservation for accommodating Ani'ya, who was resistant to the change in lifestyle, but we see nothing in this record indicating a change in the risk of harm, given the understanding that this is how Ani'ya had been living for several months with Carlson's approval and with little concern from Buford. While similar situations may yield proof of a risk of harm, given our de novo review of these specific facts, the State did not meet its burden.

## CONCLUSION

Because we conclude that the juvenile court erred when it found sufficient evidence that Travell's daughter, Ani'ya, was within the meaning of § 43-247(3)(a), we reverse the adjudication order and remand the cause with directions to dismiss the petition.

REVERSED AND REMANDED WITH DIRECTIONS.