IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF ETHAN L.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF ETHAN L., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

JESSIKA M., APPELLANT, AND JOSE L., APPELLEE.

Filed December 26, 2024.    No. A-24-136.

Appeal from the County Court for Platte County: DENISE J. KRACL, Judge. Affirmed.

Emilee Higgins, of Law Office of E. Higgins, L.L.C., for appellant.

Morgan L. Smith, of M.L. Smith Law Office, L.L.C., for appellee guardian ad litem.

PIRTLE, BISHOP, and ARTERBURN, Judges.

ARTERBURN, Judge.

## INTRODUCTION

Jessika M. appeals from the order of the Platte County Court, sitting as a juvenile court, which terminated her parental rights to her minor child, Ethan L. Jessika argues that the court erred in finding that statutory grounds for termination of her parental rights existed and that termination was in Ethan's best interests. Upon our de novo review, we affirm.

## BACKGROUND

Jessika is the biological mother of Ethan, who was born in September 2019. Ethan has two siblings through Jessika. Dekira M., Ethan's sister, resided with Jessika and Ethan prior to these proceedings. According to the court's findings herein, Dekira was ultimately placed with her father in Rhode Island. Esau M., Ethan's brother, was placed with his maternal grandmother in

- 1 -

Guatemala prior to these proceedings. Ethan's siblings were not involved in the present juvenile court proceedings and, as a result, are not a part of this appeal.

Jose L. is Ethan's biological father, and he was involved in the juvenile court proceedings. Jose was convicted of a domestic violence charge which resulted in a no contact order being issued between him and Jessika. As a result, most of their court reports and hearings were bifurcated. However, the trial on the State's motion to terminate their parental rights was conducted with both of them present in the courtroom. This appeal concerns only Jessika's parental rights to Ethan. As a result, we discuss the other children as well as Jose's involvement in the case only to the extent necessary to provide context.

In January 2022, Jessika was participating in a voluntary case with the Nebraska Department of Health and Human Services (DHHS). At that time, Jessika had separated from Jose due to incidents of domestic violence and was living in her car with Ethan and Dekira. She was not employed, and there were concerns that she could not meet the children's needs. It was also reported that due to their living arrangement, Dekira was missing school. DHHS provided family support, but after 2 weeks, the voluntary case was considered completed when the children were removed from Jessika's care.

The removal occurred on February 15, 2022. On that day, the State filed an affidavit for temporary detention alleging that Ethan and Dekira were children within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). The affidavit stated that earlier that day, during a family support session, Jessika made comments about wanting to kill herself. Jessika also remarked that the children "would be better off being adopted" or "being in the State's custody." A therapist assessed Jessika and recommended that she be placed into emergency protective custody. When DHHS employees contacted law enforcement and informed Jessika that she was going to be placed into custody, she fled the building, leaving Ethan and Dekira behind. Law enforcement chased Jessika for four blocks before detaining her. Ethan and Dekira were subsequently placed into the temporary custody of DHHS.

The following day, the State filed a formal petition alleging that Ethan was a juvenile within the meaning of § 43-247(3)(a). The State filed several amended petitions related to Ethan, Jessika, and Jose. At their respective adjudication hearings, Jessika and Jose each entered admissions to certain allegations in the petitions, and Ethan was adjudicated under § 43-247(3)(a). In June 2022, the court ordered Jessika to cooperate with DHHS, submit to random drug testing twice per week, and obtain a substance abuse evaluation.

Approximately 1 year later, on June 8, 2023, the State and the guardian ad litem (GAL) filed a joint motion to terminate Jessika and Jose's parental rights to Ethan. The motion alleged that the grounds for termination of Jessika's parental rights were based on Neb. Rev. Stat. § 43-292(2), (4), and (6) (Reissue 2016) and that termination was in Ethan's best interests.

Trial on the motion was held on October 17, 2023. Jessika and Jose were permitted to be in the same courtroom for the trial. At the State's request, the court took judicial notice of the affidavit of removal, the third amended petition, and the adjudication order. At the GAL's request, the court took judicial notice of the GAL's reports and recommendations previously filed in this case. No objection was made to either request.

Giselle Adame, a DHHS child and family services specialist, became Jessika's case manager in January 2022 when Jessika participated in the voluntary case with DHHS. Jessika's

primary language is Spanish. Adame was assigned to the case because she is fluent in both Spanish and English. Adame has been the only case manager assigned to the case. Throughout the pendency of this case, Adame prepared four court reports and accompanying case plans concerning Jessika's progress. All four reports were received as exhibits at trial.

The first case plan details Jessika's performance and progress from February 2022 to August 2022. At that time, the overall permanency goal was reunification. In March 2022, Jessika completed a risk assessment. She received a very high risk score due to prior DHHS investigations, past and current mental health struggles, alcohol consumption, drug use, and homelessness. The assessment recommended ongoing services. Jessika's specific case goals included obtaining stable housing and stable employment, attending supervised visitation and family support sessions, participating in drug testing, and completing all required evaluations.

Adame testified that by August 2022, Jessika had not secured stable housing or employment. Initially, Jessika was living with her stepfather, but in April 2022, she reported that she was renting a room in a house that she had found online. Jessika refused to give Adame the address for that home. The following month, Jessika reported that she had moved again, this time to live with her supervisor from work. In July 2022, Jessika reported that she was no longer living with her supervisor but refused to provide Adame the address of her current residence. After Adame insisted, Jessika reported that she now owned and was residing in the home she and her stepfather had previously lived in together. Regarding employment, Jessika was initially employed by ACI Plastics, but that employment ended in May 2022. Jessika then reported that she was employed by the Sapp Bros Company.

During this review period, there were also issues with Jessika's behavior during visitation. Visitation was originally facilitated by Good Life Counseling. In March 2022, the first visit ended early due to Jessika's behavior. Jessika was complaining about Adame, Ethan and Dekira's foster parents, and "the system." Jessika specifically told Dekira that her foster parents did not "give a fuck about [her]."

During another visit in March 2022, the visitation worker, who was bilingual, reported that Jessika kept cursing in Spanish. Jessika was reported as saying "motherfucking son" to Ethan and "motherfucker" to the visitation worker. Jessika also told Dekira that all the individuals involved in the case were "bad people." The children were upset by Jessika's behavior. Further, Jessika was not paying close attention to Ethan during this visit, and as a result, he almost ran into the street while vehicles were passing by. After this incident, Good Life Counseling put Jessika's visitation on hold.

To resume visitation, Good Life Counseling provided Jessika with the following rules: respectful behavior toward visitation workers, no cursing, adequate monitoring of the children, no conversations about the juvenile case, and if Jessika was redirected more than three times, visitation would end. Jessika agreed to these rules. Nevertheless, another visit in March 2022 ended early because Jessika did not adhere to the rules. She cursed at Ethan and called the visitation worker a "whore." Jessika also screamed at Dekira and told her not to talk to or trust anyone because they "report to the judge and they are bad people."

As the visitation worker directed Ethan and Dekira into the car to leave, Jessika started screaming and slammed the car door closest to Ethan. The visitation worker was concerned that if Ethan had extended his hand out, the door would have broken it. Due to Jessika's outburst, the

following visit was canceled, and Good Life Counseling ultimately suspended its family support services for Jessika.

In March 2022, Adame contacted Better Living to facilitate visitation and family support. Visits with Better Living were going well, and reports indicated that Jessika was being respectful to case workers. Unfortunately, in April 2022, Better Living's only bilingual employee resigned, and Better Living could no longer offer services to Jessika.

In April 2022, Adame contacted Oasis International Counseling to facilitate visitation. In May 2022, an Oasis visitation worker reported that Jessika was providing only sweets, not proper meals, to the children. Jessika was also sleeping during visits. The worker further reported that Jessika continuously asked Dekira if her foster parents were physically abusive because Jessika observed bruises on Ethan's knees.

In June 2022, visitation with Oasis ended after Jessika threatened to assault Dekira and kill a visitation worker during a visit. Jessika also called the visitation worker a "damn bitch." Due to Jessika's aggression and threats, the visitation worker had to contact law enforcement.

Later that same month, the incident was brought up during a family team meeting at the DHHS office. Jessika insisted that Oasis was lying about the incident and walked out of the meeting. Jessika then began slamming doors and yelling while walking around the office. Jessika was drug tested and the results were positive for methamphetamine. After being informed of the results, Jessika began screaming and crying, insisting that she did not understand how she tested positive. Jessika refused to leave the premises and screamed at caseworkers who approached her. Law enforcement was called, and Jessika eventually left.

From late June 2022 to early July 2022, visits were put on hold because Jessika was incarcerated for possession of methamphetamine. After Jessika was released, visits resumed and were facilitated by Independence Rising. The agency did not have a bilingual employee, so Jessika agreed to speak only English during visits. Despite this agreement, the agency reported that Jessika often spoke in Spanish.

Through August 2022, Jessika's attendance at family support sessions was poor. Of the 13 family support sessions scheduled, Jessika attended 4, did not show for 6, rescheduled 2, and canceled 1. Further, she was not meeting her family support goals. These goals overlapped with her specific case goals and included money management, budgeting, and developing parenting skills.

Jessika also failed to comply with the court-ordered drug testing. In May 2022, Jessika failed to submit to any drug tests. In June 2022, Jessika only submitted to one test, and that test was positive for methamphetamine. In July 2022, Jessika again only submitted to a single test, but that test was negative for substances. In total, between April and August 2022, Jessika tested positive for drugs three times.

In June 2022, the court ordered Jessika to complete a substance abuse evaluation. During the evaluation, Jessika behaved erratically, and the evaluation could not be completed. A second evaluation was successfully completed a month later, but Jessika did not receive or provide the results to DHHS because she did not pay the required fee. Jessika also completed an initial diagnostic interview around this time. The results recommended that Jessika attend individual counseling and follow any additional recommendations of DHHS. Jessika complied and enrolled in individual therapy.

The second review period ran from August 2022 to January 2023. Jessika did not secure stable housing or stable employment during this time. She reported that she was now living in a trailer home with her sister, which concerned Adame because Jessika's sister was a reported methamphetamine user who contributed to Jessika's methamphetamine use. In terms of employment, Jessika reported that she had acquired a new job working in construction. This employment could not be verified by Adame.

During this period, Jessika attended only 3 of 23 family support sessions. However, she attended 32 out of 41 visits. Three visits were canceled due to sickness, another 3 were canceled due to transportation issues, 2 were canceled due to weather, and 1 was canceled due to Jessika's work schedule. Because of Jessika's living situation, visits occurred either at a local church or at the DHHS office.

Jessika continued to struggle to provide proper meals for Ethan. There were also visits where Jessika failed to redirect Ethan when he became upset and threw things. During some visits, Jessika would become upset and begin cursing and talking about the case in front of Ethan.

In November 2022, Jessika brought her sister to a visit even though her sister was not approved by DHHS to attend visitation. During the visit, Jessika put Ethan in her car and refused to release him to the visitation worker. The visitation worker called law enforcement, and only after officers arrived did Jessika relent and allow Ethan to exit the vehicle.

DHHS attempted to conduct several drug tests during this review period. In total, Jessika refused to participate in 31 tests. Of the tests she did take, 3 were positive for methamphetamine. Jessika admitted to using methamphetamine and stated that she did not see an issue with her drug use. In January 2023, the case plan permanency goal was revised to reunification with a concurrent plan of adoption.

The third review period covered the period of January through April 2023. Once again, Jessika failed to secure stable housing or stable employment. She was initially living with church friends but was not paying rent because she was unemployed. Adame performed a walkthrough of this residence and found it suitable for visitation. However, when Jessika stated that her roommates were willing to provide for her and her children if they were to move in, Adame informed her that was not an option and that Jessika had to provide for herself and her children independently.

During this review period, Jessika attended 8 out of 11 scheduled visitations. Three visits were canceled due to transportation issues, Ethan being sick, or bad weather. Due to ongoing safety concerns with Jessika, the visitation agency required that two visitation workers be present during her visits, but visits did occur in Jessika's residence. It was reported that Jessika was receiving financial help from her roommates to provide snacks, meals, and other necessities for Ethan during visits. The visitation workers also reported that they observed a bond between Jessika and Ethan.

During one visit in February 2023, Jessika called Ethan's foster mom a "bitch" and described her as "fucking fat." The visitation worker intervened three times, each time warning Jessika that the visit would end if she did not correct her behavior. Jessika responded that she "could do whatever [she] 'fucking' want[ed]" and stated that "[i]t's 'shit.' You are all 'shit.'" At the end of the visit, Jessika purposely bumped into the visitation worker, hitting the worker's shoulder. Jessika also sent the visitation worker the following message: "all the 'whores' in this dump can put their 'fingers up their asses' but they are not going to teach my children that and if

you don't know how to clean your 'ass' learn to clean [it] from a baby that you love to 'shit on' . . . the 'fat bitch' and the '4 eyes' know exactly where they live."

From March 13 until April 20, 2023, Jessika was incarcerated. Jessika was sentenced to jail based on a conviction for making threats toward Adame. Visitation resumed upon Jessika's release.

During this review period, Jessika attended 9 of 11 family support sessions. Two sessions were canceled because Jessika was ill. During a February session, Jessika began cursing at her family support worker, causing the worker to feel unsafe.

Jessika completed 10 tests during this time period. One test was positive for methamphetamine and amphetamine. In February 2023, she refused to submit to a drug test because she stated that she knew the test would have positive results. Jessika also reported that she spent $100 each week on drugs, but that she wanted to stop using. Jessika completed another substance abuse evaluation which recommended that she attend therapy, acquire a sponsor, complete a 12-step program, and practice a substance-free lifestyle. Jessika obtained a sponsor and started attending substance abuse counseling.

The fourth and final review period began in April 2023 and ended in August 2023. In July 2023, Jessika moved from the residence she shared with friends to her own individual residence. Adame testified that this was a step toward obtaining stable housing but that Jessika needed to show that she could keep and maintain the home long-term. Regarding employment, Jessika once again reported that she had a new job, this time at a Super Saver store. Adame was unable to confirm this employment. Sometime later, Jessika reported that she was working at a hotel, which Adame was able to confirm, but Jessika only worked there for a month. Jessika then reported she was working at CSS Farms. Adame was unaware of whether Jessika had maintained this employment.

Jessika began to improve both her behavior and attendance at visitation. She attended 31 of 34 visits, and the 3 visits she did not attend were canceled because Ethan was ill. Visits continued at the shared residence until Jessika moved into her own residence, which was also approved for visitation. Additionally, Jessika was continuing with individual therapy, although she reported to Adame that it was a waste of time, and she was reluctant to participate.

Unfortunately, Jessika also continued to exhibit poor behavior at visitation. Once again, Jessika brought her sister to visitation despite clear instructions from DHHS that her sister was not allowed. Additionally, during a visit in June 2023, Jessika raised her voice and threatened to hit Ethan with a zip-tie. During another visit in July 2023, law enforcement was called because Jessika locked herself in the bathroom with Ethan. Jessika stated that she wanted to give Ethan a bath, but against supervised visitation rules, she would not allow the visitation worker into the room. Jessika eventually came out of the bathroom with Ethan.

Between April and August 2023, Jessika completed 30 out of 31 drug tests. Jessika tested positive once in July for methamphetamine, amphetamine, and THC. Jessika did not admit to any use during this time.

Adame testified that Jessika's progress between August 2023 up until the day of trial had regressed significantly. At that time, visits between Jessika and Ethan were occurring virtually. This was because of an incident in August 2023 when the visitation worker told Jessika that her

sister could not be present for visitation. Jessika became very upset, cursed at the worker, and came very close to the worker's face. Due to safety concerns, the worker left with Ethan.

The visitation agency requested that visits be conducted in a more neutral setting, outside of Jessika's home. DHHS agreed and offered Jessika transportation to those out-of-home visits. Jessika refused and sent several inappropriate messages to the visitation workers, calling them "bitches, whores, and other words." In response, the agency requested that visits be conducted virtually to ensure the safety of its employees.

The virtual visits were difficult for Ethan. He struggled to sit still and communicate with Jessika. Adame testified that Ethan's age and lack of attention span likely contributed to his disinterest in virtual visits. However, Adame also testified that Jessika did not do much to engage Ethan, spent most of the visits crying, and often ended the visits early.

In addition, at the time of trial, the drug testing company was no longer providing Jessika with at-home testing services because she had called the workers names. Jessika alleged that she could not participate in out-of-home drug testing because she did not have the proper schedule or resources to drive to the facility. Jessika testified that despite this conflict, she was working hard and making progress on remaining sober.

Adame testified that throughout the entire case, communication with Jessika was difficult and unproductive. Jessika regularly screamed and cursed at Adame during phone calls and in-person meetings. Jessika called Adame names like "bitch," "whore," and "slut" during conversations. During one phone call in August 2022, Adame informed Jessika that the court was pausing her visits with Dekira. Jessika screamed at Adame, called her a "bitch" repeatedly, and hung up on her. Later, Jessika called Adame back and told her "wait 'till I find out where you live and I swear you are going to die." Jessika called Adame again and told her to do her job correctly and that she wished Adame dead. Adame notified law enforcement, and a report was filed against Jessika.

Jessika admitted to having dreams in which she hurt Adame. Jessika also alleged that Adame had sexual relations with Jose, and consequently, he was given more visits with Ethan. Jessika "offered men" to Adame so that "she [could] do her job correctly."

At the termination hearing, Jessika admitted to yelling at Adame and other caseworkers, calling them names, and cursing at them in Spanish. She explained that she yelled "at people who [were] messing with [her] son." Jessika further testified that she loved and missed Ethan very much.

Adame testified that at the time of trial, Ethan had been in foster care for 20 months and was doing well there. In contrast, Jessika was no longer attending individual therapy, was not attending substance abuse therapy, was not attending family support, and was not complying with drug testing. Adame also testified that Jessika was unwilling to communicate and continued to yell and curse at Adame and blame Adame for her situation.

Adame testified that throughout this case, she was never able to report that Jessika had made significant progress toward reunification. Additionally, Adame was never able to recommend that it would be in Ethan's best interests to be returned to Jessika's custody. Adame further testified that this case had an excessive amount of law enforcement involvement. Adame summarized Jessika's case participation as making short term progress on certain goals but being unwilling or unable to make and maintain long term progress. Adame did not believe that

permanency could be achieved with Jessika and that it was in Ethan's best interests to terminate Jessika's parental rights.

At the close of the evidence, the juvenile court took the matter under advisement. On January 19, 2024, the court issued a 33-page order terminating Jessika and Jose's parental rights to Ethan. The court found that the State had met its burden of proof as to the statutory grounds alleged in the motion and that termination of Jessika's parental rights was in Ethan's best interests.

The court observed that during the pendency of this case, Jessika was often unpredictable and aggressive, which resulted in many hardships, including Jessika being incarcerated for over a month. The court also noted that DHHS workers were frequently contacting law enforcement due to her behavior. Despite multiple efforts from DHHS, the court found that "Jessika's anger, temper, and insults never abated."

Further, the court noted that Jessika did not cooperate with drug testing, continuously tested positive for illegal substances, and occasionally admitted use of said substances. Jessika's lack of stable housing and employment further informed the court that Jessika was not fit to parent Ethan. The court concluded that Jessika generally failed to comply with the court orders in this case and that she had not completed the work necessary for reunification.

Jessika appeals.

ASSIGNMENTS OF ERROR

Jessika assigns that the juvenile court erred in determining that (1) statutory grounds existed to terminate her parental rights and (2) termination was in the child's best interests.

STANDARD OF REVIEW

Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings; however, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over the other. *In re Interest of Prince R.*, 308 Neb. 415, 954 N.W.2d 294 (2021).

ANALYSIS

Termination of parental rights is a two-part inquiry. To terminate parental rights, a court must find by clear and convincing evidence that one of the statutory grounds enumerated in § 43-292 exists and that termination is in the child's best interests. *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016). There are 11 bases for parental termination under § 43-292. Only one must be met to provide the statutory basis for termination. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). Once one of the bases is met, the appellate court does not need to consider the sufficiency of the evidence concerning the State's other bases for termination. *Id.*

*Statutory Grounds for Termination.*

The State and the GAL sought termination of Jessika's parental rights under § 43-292(2), (4), and (6). The juvenile court found that the State met its burden of proof with respect to all three alleged bases. Jessika argues that the court erred in determining that these three subsections were met.

- 8 -

Subsection 43-292(2) allows for termination of parental rights if the parents have substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile necessary parental care and protection. A parent's failure to provide an environment to which his or her children can return can establish substantial, continual, and repeated neglect. *In re Interest of Joseph S. et al.*, 291 Neb. 953, 870 N.W.2d 141 (2015). Past neglect, along with facts relating to current family circumstances which go to best interests, are all properly considered in a parental rights termination case under § 43-292(2). *Id.*

After reviewing the record, we conclude that the State and the GAL demonstrated by clear and convincing evidence that Jessika substantially and continuously or repeatedly neglected and refused to give Ethan necessary parental care and protection. In short, Jessika never demonstrated an ability to provide a stable, nurturing environment for Ethan. She continued to struggle to maintain stable housing and employment. Her mental health challenges and continued drug use exacerbated these issues and her overall ability to parent Ethan appropriately.

This case was initiated after Jessika indicated a desire to commit suicide while Ethan was in her care. As the case progressed, it became clear that Jessika had serious difficulties with controlling her anger. That issue was never resolved. There were numerous reports of Jessika screaming at, threatening, and name calling Adame and other case workers. These behaviors occurred not only during phone calls but also during in-person meetings and visitation sessions with Ethan.

Jessika often put Ethan at risk when she allowed her anger to dictate her actions. While arguing with a visitation worker, she could have smashed Ethan's hand in a car door when she slammed it if Ethan would have stuck his hand out. At not one but two different visits, she sequestered Ethan from the visitation workers, preventing them from monitoring his safety and welfare. Law enforcement was contacted each time.

Jessika also directed her anger toward Ethan and Dekira. Visitation workers observed Jessika yelling and cursing at both children more than once. They were upset when she behaved this way.

Jessika's anger also made it difficult for DHHS to provide her services. Two different visitation agencies stopped providing services due to her verbal abuse of their employees. Jessika's violent outbursts led to an excessive amount of law enforcement involvement in this case as well. Jessika was even convicted and briefly incarcerated for threats she made against Adame.

In addition, although this case had been pending for well over a year, Jessika never secured stable, long-term housing or employment. She moved six times following the removal of the children from her care. She lived with her sister for a time, which was concerning considering her sister's methamphetamine use. Only in the final months, after the motion for termination of parental rights was filed, was Jessika able to secure independent housing, and this was too late for her to demonstrate that she could maintain such housing long-term. Further, Jessika had six different jobs throughout this case interspersed with periods of unemployment. It is unclear why Jessika left each of her former jobs, but she was unable to demonstrate that she had the ability to maintain employment and financially support herself or her children. She often relied on her roommates to supply Ethan meals at visitation and stated a desire to rely on her roommates for financial support when she was reunified with Ethan. Meanwhile, she reported spending $100 each week on drugs.

Jessika also continuously tested positive for methamphetamine and failed to fully comply with the drug testing schedule. At one point, she told Adame that she did not understand why her drug use was a problem. At the time of trial, Jessika was not participating in any drug testing, and had stopped attending substance abuse counseling.

In summary, the record shows that Jessika failed to develop or maintain the necessary skills to provide the parental care and protection Ethan requires. Her anger, unstable housing, unstable employment, and drug use created an environment to which Ethan could not return. Thus, there was clear and convincing evidence that Jessika substantially and continuously or repeatedly neglected and refused to give Ethan the necessary parental care and protection that he needed. The juvenile court did not err in finding that under § 43-292(2) a statutory basis for termination existed. Because we have found that § 43-292(2) was met, we need not consider the sufficiency of the evidence concerning the State's other alleged bases for termination. See *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021).

*Best Interests.*

Jessika also assigns and argues that the State failed to prove that it was in Ethan's best interests to terminate her parental rights. In addition to proving a statutory ground, the State must show that termination of parental rights is in the best interests of the child. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019). A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must show that the parent is unfit. *Id.* There is a rebuttable presumption that the best interests of the child are served by having a relationship with his or her parent. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id.*

Generally, when termination is sought under other subsections of § 43-292, the evidence adduced to prove the statutory grounds for termination will also be highly relevant to the best interests of the juvenile, as it would show abandonment, neglect, unfitness, or abuse. *In re Interest of Joseph S. et al.*, 291 Neb. 953, 870 N.W.2d 141 (2015). In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *Id.*

Jessika specifically argues that she "consistently and significantly made progress on her treatment and case plan goals but was never allowed to move forward . . . due to ongoing issues between [herself] and her caseworker." Brief for appellant at 27. We disagree. The evidence overwhelmingly showed that Jessika failed to make significant, long-term progress on any of her case plan goals. As we iterated above, Jessika's anger never abated, she never secured long-term housing or employment, and she continuously tested positive for methamphetamine.

Further, there was no evidence that Jessika's progress was hindered due to "ongoing issues" with Adame or any other case worker. The evidence showed that Jessika repeatedly mistreated case workers and that agencies terminated services only after giving Jessika several chances to correct her behavior. Any perceived "ongoing issues" between Jessika and her case workers were the direct result of Jessika's aggressive rhetoric and behavior.

With regard to Adame specifically, the evidence shows that despite Jessika's horrible treatment of Adame, Adame consistently worked to support Jessika. Adame found new service providers to facilitate visitation each time an agency withdrew from the case. Despite the verbal abuse, the baseless accusations, and the threats to life, Adame never withdrew from this case, and there was no evidence that she in any way mishandled this case or mistreated Jessika.

Jessika's inability to move forward in this case is attributable only to her own actions and inactions. In addition to all the behaviors we emphasized above, we also note that Jessika exhibited poor parenting skills during visitation. She was unable to provide proper meals to Ethan without assistance, she was observed sleeping during visits, and her failure to adequately monitor Ethan resulted in him nearly running into the street while traffic was present. Jessika never progressed beyond supervised visitation. Further, Jessika repeatedly attempted to bring her sister to visitation, resulting in conflict with DHHS workers. Her association with her sister was another concern in and of itself, as DHHS indicated that the sister contributed to Jessika's drug use.

We recognize that while Jessika often struggled in this case, she did make some efforts to rehabilitate herself. This included attending therapy and utilizing substance abuse resources. However, those efforts were never consistent and were overshadowed by her behavior during the last few months prior to trial. The progress she made was negated when she harassed visitation workers in her home but refused to be transported to a neutral location for continued visits. This resulted in her regression to virtual visitation. She also harassed drug testing employees, resulting in out-of-home testing, which she refused to submit to. Finally, she quit all forms of therapy, despite court orders to continue with treatment.

When a parent is unable or unwilling to rehabilitate himself or herself within a reasonable period of time, the child's best interests require termination of parental rights. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). This case was pending for 20 months, and during that time, Jessika failed to rehabilitate herself. Meanwhile, Ethan was placed in an of out-of-home placement where he grew and made steady progress. Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). We conclude that the State established by clear and convincing evidence that it was in Ethan's best interests that Jessika's parental rights be terminated.

## CONCLUSION

For the foregoing reasons, we affirm the order of the juvenile court terminating Jessika's parental rights to Ethan.

AFFIRMED.